LUKE P. POLAND, Trustee, v. LAMOILLE VALLEY RAIL-
ROAD COMPANY and Others:

CROSS-CAUSE,

LUKE P. POLAND and ALBERT B. JEWETT, Trustees, v.
LAMOILLE VALLEY RAILROAD COMPANY and Others;

AND CROSS-CAUSE,

GEORGE E. HOWE and Others v. LAMOILLE VALLEY
RAILROAD COMPANY and Others.

[ IN CHANCERY. ]

*Contract.    Mortgage.    Pledge.    Priorities Among Holders of
Railroad Mortgage Bonds.    Gen. Sts. c. 28, ss. 101, 102.
Trusts.    Receivership.    Lien.*

On May 1, 1871, three railroad companies that were associated together for the pur-
pose of building and running their several roads as one continuous line, executed
a mortgage deed of their several roads and of all the personal property and income
thereof, together with all their corporate rights, in trust, to secure the payment of
their joint bonds to the amount of $2,300,000.   The bonds were executed, and sold
or pledged.   On April 1, 1874, the same companies executed a second mortgage of
the same property to the same trustees, to secure the payment of their joint bonds
to the amount of $1,770,000.   Bonds to the amount of about $125,000 were issued
thereunder.   On January 1, 1875, those companies, with others, executed a mort-
gage of all the property of their several roads, including the property conveyed by
the previous mortgages, to other trustees, in trust, to secure the payment of their
joint bonds to the amount of $9,500,000.   Bonds to the amount of about $80,000
were issued thereunder.   On July 18, 1876, the proceeds of all the bonds so issued
being expended, and the companies being insolvent and still in need of funds to
complete their roads, the first-mentioned companies executed a fourth mortgage
of the property conveyed by the first mortgage to one of the trustees in the first
and second mortgages, in trust, to secure the payment of their joint bonds to the
amount of $500,000.   That mortgage provided, among other things, that no bonds
should be issued thereunder until holders of the first-mortgage bonds to the amount
of $1,800,000 had first signed an agreement whereby they should severally agree
that, for the purpose of completing the roads and paying the interest on certain
debts, said companies might issue such bonds, "to be denominated preference
bonds", which should constitute and be a lien "on the property conveyed by such
mortgage prior to the bonds held by" the several signers thereof.   Such an agree-
ment was signed by holders of first-mortgage bonds to the amount of about
$1,870,000.   A bill was brought by the trustee under the last mortgage for a fore-
closure thereon; and a cross-bill was brought by the trustees under the first mort-
gage for a foreclosure thereon.   Both bills prayed for a settlement of priorities, and
for general relief.   *Held*, that the agreement operated an equitable mortgage or

Poland *v.* Railroad Company.

pledge of the interest under the first mortgage of those who signed, as security for the payment of the preference bonds; but that it in no way affected the interest, or the priority of the lien, of those who did not sign.

Each mortgage provided that until default in payment of bonds or interest thereon or default in regard to something by them agreed to be done, &c., the mortgagors should have possession of their roads and take the income, &c., thereof, but that in case of default for four months after demand, and on request of certain bondholders, the trustee or trustees therein named should take possession of the roads, and operate the same, and take the income thereof, and pay, first, the expenses of operating, &c. Default was made in the payment of interest on the bonds, but none of the trustees took possession. But one of them filed a bill, as aforesaid, alleging that the roads were largely indebted to many persons who were not secured, and that, if they remained in the hands of the mortgagors, all the income and personal property thereof would be taken for the payment of such debts, and diverted from the payment of interest on the bonds; and praying that all the bondholders, companies, and trustees be made parties, and that receivers be appointed to operate the roads under order of court until final decree should be made. Receivers were accordingly appointed. Those who before the appointment of receivers had sold oil to the mortgagors for use in operating the roads, and had performed services for them as mechanics for like purposes, thereupon filed a cross-bill alleging their debts, and praying that an account be taken thereof and of all like debts due to others who might come in, &c., that the receivers be ordered to pay them out of the income of the roads, and forbidden to pay any portion of the income to bondholders until they had paid them, and that their debts be decreed to be a first lien on all income, furniture, cars, engines, &c. *Held*, that, as the orators in the cross-bill were seeking as a class to enforce a common right against a common fund, they had proper standing in court, and the bill was not multifarious: that under ss. 101, 102, c. 28, Gen. Sts., the orators in the cross-bill had a legal right to attach the chattel property of the companies, to which the liens of bondholders were subordinate; that the appointment of receivers altered no existing right, as the receivers held for all interested parties, the orators in the cross-bill, as well as the bondholders; that the court, having taken jurisdiction, would retain the cause for final determination of all questions arising on the claims of any interested party; and that the receivers should be made chargeable as holding the chattel property subject to such creditors' rights.

Each mortgage was upon trust, among other things, that until default, and while the mortgagors remained in possession and operated the roads and took the income, as aforesaid, they should apply the income "to the payment of the current expenses of the road . . . or dispose of the same for the lawful uses " of the mortgagors. The net earnings were in part expended in making new road to the enhancement of the value of the mortgaged property; and the chattels of the several roads were lessened in value by use in the making of income. *Held*, that, as by the terms of the mortgages the mortgagors were bound to pay the current expenses from the current earnings, the mortgagees took their security burdened with that trust; that the mortgagees, out of possession, had no right to earnings superior to the mortgagors'; and that the receivers should be ordered to apply the net income first to the discharge of debts that were for such expenses.

It was *held* that the protection afforded to creditors by the statute extended to creditors who were engaged in manual labor in making repairs or in operating the roads, or who had furnished materials to be used therein, as iron, ties, lumber, wood, coal, oil, &c., even although such creditors had taken promissory notes for their claims, as it was not to be presumed from a change in the form of indebted-

ness that it was intended to waive the priority of lien; but that such protection did not extend to claims for services of directors, superintendents, civil engineers, attorneys, cashiers, paymasters, or heads of departments, nor to claims for rent of offices occupied by them, nor to claims for telegraphing ordered by them, nor to claims for the printing of tickets, bill-heads, posters, time-tables, &c., and the materials used therein.

APPEAL from the Court of Chancery. The bill disclosed the following case :

On May 1, 1871, the Lamoille Valley Railroad Company, the Montpelier & St. Johnsbury Railroad Company, and the Essex County Railroad Company, which had been duly chartered by the Legislature, and had entered into a joint arrangement for building and equipping their several roads as one continuous line from the Connecticut River to Swanton, on Lake Champlain, to be known as the Vermont Division of the Portland & Ogdensburg Railroad, and for operating the same as such a line, in order to raise money to construct and equip said road, executed to the orator Poland and Abraham T. Lowe a mortgage deed of their several railroads, including all their real and personal property, together with their tolls and income, and all their corporate rights and franchises, in trust, to secure the payment of their joint bonds to the amount of $2,300,000, with six-per cent. semi-annual interest coupons thereto attached. That deed was duly accepted by the trustees therein named, the bonds thereby to be secured were duly executed and sold or pledged, and the money thereby obtained was afterwards all used in building and equipping said several roads. On April 1, 1874, said companies executed another like deed of the same property to the same parties, in trust, to secure the payment of the joint bonds of said companies, denominated second-mortgage bonds, to the amount of $1,770,000. The bonds thereby to be secured were duly executed, but only one hundred and twenty-five of them, amounting to $125,000, were ever issued, and they were pledged to the Portland & Ogdensburg Railroad Company, as security for an indorsement of the notes of said company for $50,000, which were never paid. On each of the bonds so pledged were stamped the words, " This bond and all bonds secured by the joint mortgage dated April 1, 1874, are subject to the prior lien of the joint preference bonds

to the amount of five hundred thousand dollars, secured by a joint mortgage dated July 18, 1876, and this bond is sold subject to the prior lien of said preference bonds on the roads and their earnings." On January 1, 1875, said companies, jointly with the Lamoille Valley Junction Railroad Company and the Portland & Ogdensburg Railroad Company executed a like deed of their several railroads and the franchises and property of each to Israel Washburn, Jr., Philip H. Brown, and the orator, in trust to secure the payment of the joint bonds of all of said companies to the amount of $9,500,000, of which bonds to the amount of about $80,000 only were executed and sold or pledged. On July 18, 1876, the first-named three companies, having expended the proceeds of the first-mortgage bonds, being unable to negotiate the second-mortgage or third-mortgage bonds, and needing $500,000 to complete and equip their roads, executed another like deed of the property conveyed by the said first-mentioned deed to the orator, in trust, to secure the payment of their joint bonds to the amount of $500,000. It was thereby provided that no bonds should be issued thereunder until the holders of bonds issued under the first mortgage to the amount of $1,800,000 had signed an agreement in writing, as follows:

We whose names are hereto subscribed, holders of bonds of the numbers and amounts set against our respective names, issued under, and secured by, the first mortgage of the Essex County Railroad Company of the Montpelier and St. Johnsbury Railroad Company, and of the Lamoille Valley Railroad Company, hereby severally agree that for the purpose of completing and equipping the line of the said several roads to Lake Champlain, in Swanton, Vt., under existing contracts or otherwise, and of paying the interest on the debts, for the payment of which a portion of such bonds are pledged, the said several railroad companies may issue bonds to be denominated preference bonds, in character like the first mortgage bonds, to the amount of five hundred thousand dollars, secured by a joint mortgage of the several railroads and their equipment like unto the first mortgage thereof, which shall constitute and be a lien on the same, prior to the bonds held by us severally, the mortgage and bonds to be made to Hon. Luke P. Poland as trustee ; said preference bonds to be payable, principal and interest, in gold, in twenty years, and at the option of said companies after five years from the 1st day of May, A. D. 1876, and to bear interest at the rate of six per cent. per annum semi-annually. This agreement and consent is not to

be binding until the holders of the first mortgage bonds to the amount of eighteen hundred thousand dollars shall execute the same, nor until the trustee in the preference mortgage, being one of the trustees of the first mortgage, shall consent hereto in writing ; said preference bonds are not to be pledged or sold for less than their par value without the consent of said trustee, and none of said bonds are to be issued by said trustee until he is fully satisfied that the said companies have made such arrangements and contracts, that the issue of said bonds will accomplish the completion of the line to Lake Champlain, and that said companies will pay the interest on the debts for the payment of which the first mortgage bonds are pledged, for at least two years from the date of the preference bonds.

That agreement was signed by holders of the first-mortgage bonds to the amount of about $1,870,000, and the orator signed a certificate, stating his satisfaction of the matter in the agreement referred to, and his assent as one of the trustees under the first mortgage, and as sole trustee under the proposed mortgage, to the terms of the agreement. The agreement so signed and said certificate were incorporated in the preference mortgage ; and a list of such signers, &c., was attached to the mortgage and recorded therewith in all offices where the mortgage was required by law to be recorded. The bonds provided for by that mortgage were duly executed, and nearly all of them were issued to pay for the construction of said roads and the material used therein, the remainder being retained by the trustee to pay the expenses incident to the trust. The interest that fell due on the first-mortgage and other bonds after May 1, 1876, was never paid. Lowe resigned his trust, and Albert B. Jewett was appointed in his place, and duly accepted the trust. The bill alleged that the orator had been called on by a large portion of the holders of the preference bonds to begin legal proceedings to enforce payment of interest on their bonds, or to foreclose their mortgage, and that the orator brought the bill in their behalf ; that E. & T. Fairbanks & Co. were holders of first-mortgage bonds to a considerable amount, who had signed the preference agreement, that the First National Bank of St. Johnsbury and James R. Nichols were holders of such bonds, who had not signed, that Bradley Barlow was the holder of some of such of those bonds as were pledged for the payment of loans, and that those parties, with

said Jewett, would fairly represent other bondholders in the same situation ; that Lowe and the Portland & Ogdensburg Railroad Company would fairly represent the holders of second-mortgage bonds ; that Israel Washburn, Jr., and Philip H. Brown, two of the trustees under the third or consolidation mortgage, with the Portland & Ogdensburg Railroad Company and the First National Bank of St. Johnsbury, holder of outstanding bonds under that mortgage, would fully represent all interests under said mortgage ; that the orator was informed and believed that said companies in running and operating their roads jointly became and were indebted for services and supplies furnished for such purpose to various persons who claimed to have some kind of equitable lien on the roads, or the personal property thereon, or the earnings and income thereof, and that George E. Howe, of St. Johnsbury, Vt., and Capen, Sprague & Co., of Boston, Massachusetts, claimed to be creditors of that class ; that the roads of the company were very incomplete, and must soon have a very considerable expenditure of money thereon, to run with safety ; that the companies were largely indebted to many persons who were not secured, and that, if the roads remained in the hands of the companies, all the earnings thereof and all the personal property would be taken for the payment of such debts, and diverted from the payment of the interest on the bonds ; that the orator as trustee under said preference mortgage had wholly declined to take possession of said roads and run them as trustee, as had the trustees under the first mortgage, and that they regarded it " as simply impossible for them so to do without the greatest peril of pecuniary loss and ruin to themselves."

The bill prayed that the above-named trustees and bondholders be made parties to represent their own and other like claims ; that an account be taken of the bonds outstanding under the preference mortgage and of the interest due thereon, and, so far as necessary, of the other outstanding bonds, and of those who signed and those who did not sign the preference agreement, that all questions of priority might be settled and a proper decree of foreclosure made on the preference "mortgage ; that some suitable person or persons " be appointed as receivers to take possession of

said roads and property and operate the same " under the order and protection of the court, until a final decree should be made in the premises "; and for general relief.

The mortgages were filed with the bill as a part thereof. The first mortgage was between the three first-mentioned companies as parties of the first, second and third parts respectively, and the orator and said Lowe of the fourth part. It was stipulated in the habendum thereof that the conveyance thereby made was made and accepted upon trust, and subject to limitations and conditions, first, to secure the payment of the principal and interest on the joint bonds thereby secured, ratably and without preference, and further, so far as material, as follows :

*Third.* Upon trust until default shall have been made by the parties of the first, second, and third parts in payment of the principal or interest of said bonds, or some of them, or until default shall have been made in respect to something herein agreed or required to be done by them, to suffer and permit the said parties of the first, second, and third parts to possess, use, occupy, manage, and operate the said railroad property, franchises, and appurtenances, and to renew, replace, and repair the said property and every part thereof, and take, receive, and use the tolls, rents, issues, incomes, and profits thereof, and apply the same to the payment of the current expenses of the roads, and to the purchase of necessary machinery and equipment, or dispose of the same for the lawful uses of the said parties of the first, second, and third parts, in any manner not inconsistent with this indenture. And the boards of directors of said several companies may likewise distribute and pay any net annual incomes to stockholders, after providing for the interest on any and all bonds which said companies may owe.

*Fourth.* Upon trust that in case the said parties of the first, second, and third parts shall fail, neglect, omit, or refuse to pay the principal of, or the interest upon, the said bonds or any part thereof, as the same shall respectively become due and payable, and such failure, neglect, omission, or refusal shall continue for the period of four months after the payment thereof shall have been demanded in writing, then the said parties of the fourth part, or either of them, upon the refusal of the other, or their successors in said trust, may, by themselves or their attorneys, agents, or servants in that behalf, upon the written request of the holders of a majority in amount of such bonds then outstanding in respect whereof there shall have been any such failure, neglect, omission, or refusal, enter into and upon, and take possession of, all, or, in their or his discretion, any part of the said premises and property hereinbefore described, and work and operate the said railroads and receive the income, receipts,

and profits thereof, and out of the same pay: 1st. The expenses of running and operating the same, including therein such reasonable compensations as they or he may allow to the several persons employed or engaged in running and superintendence of the same, and all taxes, assessments, charges, or liens having priority or preference to the lien of these presents upon the said premises, or any part thereof, and a reasonable compensation to the parties of the fourth part, or their successors, or such of them as shall act in the premises, for their or his care, diligence, and responsibility in the premises, and for the services of such attorneys and counsel as may have been by him or them employed, and also the expenses of keeping the said roads and appurtenances, the locomotives, and rolling stock thereof in good and sufficient repair, &c.

Under the sixth trust therein specified, the trustees were empowered, after a default of six months, and on request of the holders of three fourths in amount of the outstanding bonds, to take possession of the mortgaged premises and sell the same at auction. The other mortgages were upon like trusts.

In December following, a cross-bill was filed by said Poland and Jewett in behalf of the holders of bonds issued under the first mortgage, which made substantially the same allegations that were made in the original bill, the only difference therein being in the additional designation of the Mercantile Trust Company of New York, assenting holders of bonds issued under the first mortgage, of the National Bank of the Republic, and Isaac C. Price of Philadelphia, non-assenting holders of like bonds, and of the Portland Rolling Mills and George R. Davis of Portland, holders of preference bonds to a large amount, as proper representative parties; and the allegation of the bringing of the original bill. The cross-bill prayed that those persons and corporations, with those named in the original bill, might be made parties, that an account might be taken of the bonds outstanding under the first mortgage and of the interest due thereon, and that a proper decree of foreclosure be made on the first mortgage, and further the same as the original bill.

The defendant Nichols answered, alleging that he never assented to the preference mortgage; insisting that the bill could not be maintained against him to impair his security under the first mortgage; insisting that if a decree of foreclosure were made, the orator should be first ordered to pay the defendant and other

non-assenting holders of first-mortgage bonds the amount of their bonds in full, with interest, that if the preference mortgage had any validity against the holders of first-mortgage bonds, which the defendant did not admit, it operated only as an assignment to the holders of preference-mortgage bonds of whatever interest the holders of bonds issued under the first mortgage had thereunder; insisting that the proper remedy of the holders of bonds issued under the preference mortgage was by foreclosure of the first mortgage for the joint benefit of themselves and the non-assenting holders of first-mortgage bonds; and insisting that there could be no foreclosure on the preference mortgage, except subject to the rights of all holders of first-mortgage bonds.

The defendants Washburn and Brown and the First National Bank of St. Johnsbury answered, admitting the execution of the several mortgages in the bill mentioned, and the issue of certain bonds thereunder; alleging that certain of the bonds issued under the third or consolidation mortgage had been sold or pledged, and were still outstanding and unpaid, that the First National Bank of St. Albans held some of them, and, as the defendants were informed and believed, that George R. Davis of Portland, and A. C. Mitchell of Bellows Falls, and others, held still others of them; and insisting that, as no agreement had been made by or in behalf of such holders that the preference mortgage should take precedence of their mortgage, and as without such agreement the preference mortgage could not become a lien prior to said third mortgage, and as the bonds under the second mortgage were so issued as to give place to the bonds issued under the preference mortgage, and as the first mortgage by reason of the alleged agreement and certificate also became subordinate to the preference mortgage, and as the first and second mortgages were thus both removed from their position of priority, the consolidation mortgage became and was a first lien on the property therein described, and that a decree should be entered accordingly.

The said Howe, and Edward N. Capen and Charles Sprague, partners in trade under the name of Capen, Sprague & Co., filed a cross-bill admitting the incorporation of said three first-mentioned companies, their association for operating their respective

roads, the execution of the four several mortgages, the issuance of bonds thereunder, and the validity of the several mortgages as between the parties thereto and as against said companies, and alleging the filing of the bill and cross-bill already stated. The cross-bill further alleged that on October 18, 1877, on the filing of the bill, without the previous knowledge or consent of the orators in this cross-bill, the orator Poland procured the court to appoint Albert B. Jewett and Albert W. Hastings receivers of said roads, and that they, as such, took and ever after held possession of said roads and all the personal property belonging thereto; that, after the completion of the various portions of said roads, the actual operation thereof by the regular running of trains for the transportation of freight and passengers, was necessary for the performance of the duties of said companies to the State and the public, as well as for the preservation of the property and rights of said companies and the security of the holders of the several classes of bonds; that for the actual operation of said roads it was necessary for the officers thereof, to keep said roads and the equipments thereof in repair, and to run the same, to purchase wood, oil, and other materials, and to employ conductors, station agents, and other laborers and servants; that long before receivers were appointed as aforesaid, said companies were insolvent and in default in payment for materials, services, &c., furnished, &c., for such purposes; that before the appointment of receivers as aforesaid, said companies became indebted to the orators Capen and Sprague, in the sum of about $1,300, for oil by them furnished for said companies for current and necessary use in the running and operating of said roads, that they also became indebted to the orator Howe in the sum of about $1,600 for services by him performed as a mechanic for said companies in the necessary running of said roads and repairing of the equipment thereof, and that they also became indebted to several other persons for materials furnished and services performed for like purposes; that said debts were made in the expectation and understanding on the part of the creditors, that all the income and personal property of said companies were held for the payment of said debts; that the orators in this cross-bill had a proper lien

upon, and right of attachment against, all the income and personal property of said companies for the payment of said debts, superior in equity to the claim of any of the holders of said bonds; that the orators Howe, &c., had applied to said companies and to said receivers for payment of their said debts, which was refused, but that they would have obtained payment from the income, &c. of said roads had it not been for the appointment of said receivers, who had ever since their appointment continued to operate said roads, and to take to themselves all the income, &c., thereof, so that it became and remained impossible for said orators so to secure payment of any portion of their debts. Said cross-bill prayed that the several persons and corporations named as proper parties in precedent pleadings might be made defendants thereto; that an account be taken of the sums due when said receivers were appointed, from said companies to the orators Howe, &c., and to other like creditors who might contribute to the expenses of these proceedings; that said receivers be ordered to pay said debts and forbidden to pay any portion of said income, &c., to said bondholders until said debts should be paid; that said debts be decreed to be a first lien on all income, furniture, cars, engines, and rolling stock; that a decree be entered requiring said bondholders to pay said debts before having a decree of foreclosure in their favor; that the original bill and the first-mentioned cross-bill be dismissed with costs to said orators Howe, &c., unless said bondholders paid said debts within a time limited; and for general relief.

The cross-bill of said Howe and others was answered by said Poland, who alleged that he was informed and believed that there were some debts of the kind thereby alleged; that they were not a lien on said railroads or the personal property thereon or the income thereof; that the only right the creditors on account of such debts ever had other or different from those of general unsecured creditors of said companies, was the right to sue said companies and attach their personal property while the same was in their possession, and that, not having availed themselves of such right, they stood on the same footing with other unsecured creditors; and that if the creditors on account of such debts had any

equitable right or lien, it was only against the personal property of said companies, and not against their roads or the income thereof.

It was also answered by Isaac C. Price and by Joseph Haight, another holder of bonds issued under the first mortgage. They thereby alleged that, if there were any such debts as in said cross-bill alleged, which they did not admit, but concerning which they left the orators therein to their proof, and if any right of attachment existed in their favor, the orators then had no lien on said roads or property or income, and especially none that could have precedence of the security afforded by said first mortgage for the payment of bonds purchased without notice, as said Price and Haight alleged this to have been ; that the only right said creditors had was the right to attach the personal property of said companies while it was still in possession of the companies, and that not having availed themselves of that right, they stood on the same footing with other unsecured creditors ; that if creditors had such claims, they could not be enforced by cross-bill ; that the receivership was instituted without notice to the answering defendants, without adequate necessity, without warrant of law, and had been continued greatly to their detriment ; and that the existence thereof gave the orators in said cross-bill no right to such relief as they claimed, nor any right to seek the same by way of cross-bill.

The National Bank of the Republic, and another having like interests, demurred, for that said Howe and others, not being parties, were not entitled to maintain a cross-bill, that if they could maintain one for themselves, they could not maintain it for the benefit of others whose interests were not joint with theirs, that the matters alleged and the relief prayed for in the cross-bill did not grow out of the original bill, or the relief there sought, and that the cross-bill contained no matter entitling the orators therein to maintain the same or any cross-bill of like nature. They also moved to dismiss, for like reasons.

It was stipulated that the cross-bill of Howe and others should be treated as an answer to the original bill and the first-named cross-bill.

A master was appointed to take an account of the bonds outstanding under the several mortgages, to see how many of the holders of the first-mortgage bonds assented to the issuance of bonds under the preference mortgage, and to take an account of the debts due to said Capen, Sprague & Co., said Howe, and others whose debts were like theirs. The master found that default was made in the payment of the interest on the first-mortgage bonds in May, 1876 ; that all of those bonds were outstanding and would become due on May 1, 1891 ; that the interest due thereon on November 1, 1878, would be $534,902.50 ; that the orator Poland issued preference bonds to the amount of $410,000, and still retained the remaining bonds of that issue to the amount of $90,000 ; that holders of first-mortgage bonds to the amount of about $1,870,000 assented to the issuing of bonds under the preference mortgage, as alleged in the original bill and the first cross-bill, and upon the terms therein stated ; and that bonds issued under the consolidation mortgage to the amount of $63,000 were still outstanding and unpaid, together with some accrued interest thereon. He also found that receivers were appointed, as alleged in the cross-bill of Howe and others, that the value of the personal property of the Lamoille Valley Railroad Company at the time they were appointed was about $92,000, that after they were appointed a considerable portion of the earnings of the road had been expended on the road and on the purchase of new rolling stock, and that " from the time the road commenced running, in 1872," the earnings were sufficient to operate the road, that is, to pay for service, for the expenses of running, and for repairs to keep the road in as good condition as it was in when it began to run. Numerous claims for services performed, materials furnished, &c., were presented before the master for proof under the cross-bill of Howe, &c., and the master made a list of such thereof as were conceded to be correct. Among the latter were a claim for $1,104.26 for services of cashier and paymaster, and several claims for sums due on promissory notes that had been taken in payment of debts incurred for services performed and material furnished. There were also several claims presented to which objection was made for that they were incurred in constructing

the roads, or were for other reason not such as should be included among the claims provable under the cross-bill. Among them were a claim for $2,241.32 for telegraphing done in the usual and ordinary business of the railroad—the greater part of it in regulating the running of trains ; a claim for printing and materials for tickets, time tables, freight receipts, blanks and office stationery, advertisements, placards, &c. ; claims by the members of an executive committee of the associated roads, composed of members of the several boards of directors, for services such as are usually performed by boards of directors, and in part for a part of such as are usually performed by superintendents, and for expenses incurred therein ; a claim by the president of the Lamoille Valley Railroad Company for services, &c., as president and director, and for money that he had paid, or become liable to pay, for the company ; a claim for services and expenses of chief engineer of the same road ; and a claim for the services of an assistant civil engineer. It appeared from the master's report that the line of road composed of the three roads was in process of construction and extension the greater part of the time from before the first mortgage was issued down to the time of the appointment of receivers.

The cause was heard before POWERS, Chancellor, at the June Term, 1879, Caledonia County, when a *pro forma* decree was entered on the cross-bill of the trustees under the first mortgage in favor of the trustees, for a foreclosure against said companies and against the trustees and bondholders under the second and the consolidation mortgages, in default of payment of the first-mortgage bonds within a time therein limited ; and, in case such decree should become absolute, for a foreclosure in favor of the trustee under the preference mortgage against said companies and against such holders of first-mortgage bonds as assented to the issuing of bonds under the preference mortgage, in default of payment of the bonds issued under the preference mortgage within a time therein limited. The decree further ordered that in case of non-payment of such sums, or any of them, said trustee should be subrogated to and hold all right and interest of the assenting bondholders in

the first mortgage, or the property covered by the decree thereon ; and that the cross-bill of Howe and others be dismissed.

The trustees under the consolidation mortgage, the orators in the cross-bill of Howe and others, and J. R. Nichols appealed.

*L. P. Poland*, for the orator.

The non-assenting first-mortgage bondholders are not entitled to the first mortgage, clear, and to be redeemed in full. The question is raised faintly, if at all, by the answer of Nichols.

The exchange of places between the preference bonds and a portion of the first-mortgage bonds does not affect the consolidation mortgage.

The lien claims cannot be made a charge on the roads or their equipment. The property was all covered by all the mortgages ; and the mortgages were good as against creditors, as there was no change of possession. The statute gave no *lien*, but a right to attach while the property was in possession of the companies. *Douglass* v. *Cline*, 12 Bush. 608, which is relied on, is not law, and, if it were, it has no application here. Certain remarks of WAITE, C. J., in *Fosdick* v. *Schall*, 9 Otto, 235, are also relied on, but the decision is the other way.

*C. W. Willard* and *Thomas H. Russell*, for Nichols.

In the absence of special statutes railroad mortgages are subject to the general law of mortgages. *Dunham* v. *Railway Co.* 1 Wal. 254.

The effect of the agreement for priority of the preference mortgage, was to leave the non-assenting bondholders where they were before, with all their original rights, including a right of priority to all subsequent mortgages, unaffected by equities existing between the assenting bondholders and the preference bondholders. *Huntingdon* v. *Spann*, 1 McCord Ch. 167 ; *United States* v. *Louisville & Portland Canal Co.* 4 Dill. 601 ; *King* v. *McCully*, 38 Pa. St. 76 ; *Galveston Railroad* v. *Cowdrey*, 11 Wal. 459 ; *Pierce* v. *Emery*, 32 N. H. 484, and cases *passim*.

The holders of first-mortgage bonds had power to relinquish

their *right of legal precedence*, also the power to *substitute other persons in their* places—wholly distinct and different things ; but they did neither. The principles of subrogation are not applicable. *McCormick's Admr.* v. *Irwin*, 35 Pa. St. 111 ; *Mosier's Appeal*, 56 Pa. St. 76 ; *Ellsworth* v. *Lockwood*, 42 N. Y. 89 ; *Receivers of New Jersey Midland Railroad Co.* v. *Wortendyke*, 12 Green Ch. 658 ; *Jenkins* v. *Continental Insurance Co.* 12 How. Pr. 66 ; *Downer* v. *Wilson*, 33 Vt. 1 ; *Walker* v. *King*, 45 Vt. 525 ; Evans' Pothier, notes 275, 280, 428–430 ; *Pardee* v. *Van-Anken*, 3 Barb. 534 ; *Lamb* v. *Montague*, 112 Mass. 352, and cases *passim*. *Young* v. *Montgomery & Eufaula Railroad Co.* 2 Woods, 606 is distinguishable. Nor can the agreement be construed as an assignment. Jones Mortgages, s. 808. Had such an agreement been executed by all of the first-mortgage bondholders, would the court permit the mortgagees under the second mortgage to foreclose under the first mortgage ? or would it compel them to foreclose under their own mortgage, giving to that mortgage a prior lien ? If the latter, then the agreement in question is simply a waiver of lien. Without an assignment of the debt, there could be no assignment of the mortgage which would be of effect except by estoppel. *Aymar* v. *Bill*, 5 Johns. Ch. 570 ; *Hooper* v. *Wilson*, 12 Vt. 695 ; *Jackson* v. *Willard*, 4 Johns. 41 ; *Swan* v. *Yaple*, 35 Iowa, 248. An equitable mortgage must have some foundation in contract, or arise by necessary implication from its terms. Jones Railroad Securities, s. 77. Thus, the agreement is to be interpreted simply as a personal contract, good between the parties. *Gillig* v. *Maass*, 28 N. Y. 191 ; *New York Chemical Manufacturing Co.* v. *Peck*, 2 Halst. 37. While it exists, it acts in estoppel. *Bank of South Carolina* v. *Campbell*, 2 Rich. Eq. 179 ; *Loomis* v. *Donovan*, 17 Ind. 198. The effect of the agreement, whether intentional or not, was to give the non-assenting bondholders a lien prior to the assenting ones. Exparte *White*, in re *Jesup* v. *Wilmington & Manchester Railroad Co.* 2 Rich. Eq. N. s. 469. Thus, the preference bondholders must be postponed to the non-assenting bondholders. *Pennock* v. *Coe*, 23 How. 117. And the assenting bondholders are postponed to

the preference bondholders. *Kurtz* v. *Hollingshead's Heirs*, 3 Cranch C. C. 68.

*Guy C. Noble* and *E. J. Phelps*, for first-mortgage and preference-mortgage bondholders.

The objection of the holder of bonds under the consolidation mortgage cannot be made except by cross-bill, nor can it be made against the preferred mortgage.

. As to the answer of Nichols it is enough to say that it is not attempted to postpone the lien of non-assenting bondholders.

To the claim made under the cross-bill of Howe and others, there are several decisive answers. The debts of many claimants are not within the scope of the statute. The right given to such as have claims within its scope, is merely a right to attach. If that right is neglected no equity arises. The receivership did not prevent attachment. Had attachments been made, those first in time would have been first in right. The claim that the debts are a charge on the income of the roads is without foundation.

But it is said that the claimants have a lien on the roads themselves. That cannot be. *Dunham* v. *Railway Co.* 1 Wal. 254; *Williamson* v. *New Jersey Southern Railroad Co.* 1 Stewart, 277; *Denniston* v. *Chicago, Alton & St. Louis Railroad Co.* 4 Biss. 414; *Meyer* v. *Johnston*, 53 Ala. 237, and other cases. *Douglass* v. *Cline* is not law, and the dictum of WAITE, C. J., in *Fosdick* v. *Schall*, is inapplicable.

But in any event the cross-bill cannot be maintained. A cross-bill can be filed only by parties to the original bill. Besides, the cross-bill is joined in by those whose claims are entirely distinct.

*Davis & Stevens*, for the trustees under the consolidation mortgage.

The assenting first-mortgage bondholders, by consenting to the creation of the preference mortgage, in effect discharged their prior lien, so far as the consolidation mortgage is concerned. That the creation of the preference mortgage was intended to be contemporaneous, makes no difference. The preference mortgage

could not occupy the position of the first mortgage, nor receive any benefit therefrom, until that position was vacated by the first mortgage. The law recognizes but one way in which such an object could be accomplished without affecting intervening liens, and that is by assignment and exchange of securities. When the position of the assenting first-mortgage bondholders was so vacated, the consolidation mortgage, being next in point of time, succeeded to the position of priority. Jones Mortgages, s. 605, and cases cited.

*Belden & Ide*, for the orators in the cross-bill of Howe and others.

These orators are parties, and are entitled to maintain a cross-bill. The cross-bill is not multifarious. *Fiery* v. *Emmert*, 36 Md. 464; *Mount Carbon Coal Co.* v. *Blanchard*, 54 Ill. 240; *Stone* v. *Knickerbocker Life Insurance Co.* 52 Ala. 589; *People* v. *Morrill*, 26 Cal. 336, and cases *passim*. The matters therein alleged are proper subjects for a cross-bill. *Thielman* v. *Carr*, 75 Ill. 385; *Stevens* v. *Stevens*, 11 Green Ch. 101, and other cases.

These orators are entitled to the relief they ask on general equity principles. The law of the subject is extraordinary and peculiar. *Austin* v. *Rutland Railroad Co.* 45 Vt. 215. It is to be found in the decisions of the courts of this country. Under the mortgages the bondholders are entitled to no portion of the earnings of the roads until they obtain possession under a decree of foreclosure; and such as they have received they must restore to those who have a superior equity. The mortgages give the companies the right to take the income until default, and " apply the same to the payment of the current expenses." They give the trustees a right to enter only on default after written demand. *Ellis* v. *Boston, Hartford & Erie Railroad Co.* 107 Mass. 1, 28; *Douglass* v. *Cline*, 12 Bush. 619; *Galveston Railroad* v. *Cowdrey*, 11 Wal. 459; *Smith* v. *Eastern Railroad Co.* 124 Mass. 154; *Mississippi Valley & Western Railway Co.* v. *United States Express Co.* 81 Ill. 534; *Clay* v. *East Tennessee & Virginia Railroad Co.* 6 Heisk. 421; WAITE, C. J., in *Fosdick* v. *Schall*, 9 Otto, 235. The earnings were more than sufficient to pay these orators.

They have gone into the body of the mortgaged property. The bondholders, before taking the property, should pay these orators. Seeking equity, they should yield equity. *Myer* v. *Johnston,* 53 Ala. 237. The appointment of receivers was here a matter of discretion, and the court may now impose such conditions as it may consider equitable. *Nichols* v. *Perry Patent Arm Co.* 3 Stock. 126; *Syracuse City Bank* v. *Tallman,* 31 Barb. 201; *Ellis* v. *Boston, Hartford & Erie Railroad Co. supra; Gurney* v. *Atlantic & Great Western Railway Co.* 58 N. Y. 358; 2 Redf. Railw. 486, and cases there cited; *Fosdick* v. *Schall,* and *Douglass* v. *Cline, supra;* and cases *passim.* The money in the receiver's hands " is in the custody of the law for whoever can make title to it." 2 Redf. Railw. 363; *Booth* v. *Clark,* 17 How. 322, 331; and numerous cases. The bondholders had no right to the wood, oil, and other personal property that was in the hands of the company when receivers were appointed. It belonged in equity to general creditors. As the receivers have expended it under their appointment, it should be restored by them. Gen. Sts. c. 28, s. 101; *Palmer* v. *Forbes,* 23 Ill. 301, and other cases.

But these orators are entitled, under the statute, to a decree giving them a paramount lien on all furniture, cars, engines, and rolling stock taken by the receivers, and, if such property has depreciated in value, it must be made good. Gen. Sts. c. 28, ss. 101, 102. And see the statutes of Kentucky, New Jersey, Pennsylvania, Virginia, and Wisconsin. But it is said the orators lost their right by not attaching. That cannot be, because the bondholders first obtained possession through the receivers. The receivers are the officers of the court. They are ours as much as theirs. The appointment of a receiver fixes no priorities, changes no equities. *Booth* v. *Clark, supra;* Jones Railroad Securities, s. 494. The " grab law " does not prevail in a court of equity. 1 Story Eq. Jurisp. s. 547 *et seq.* Moreover, the mortgages did not cover property of this class as against these orators, and an acquirement of possession would give no additional rights. Nor can the bondholders maintain their position on the ground that the remedy was by attachment only, and that having failed to attach, the right is gone. The creditors, but for the right of the

court to control the property, might still attach. Jones Railroad Securities, s. 502 *et seq.* But the chancellor might allow an attachment. Jones Railroad Securities, s. 504. The court might order the rolling stock to be discharged and allow these creditors to attach it, but it would be more equitable to retain it and afford the desired relief, as, having jurisdiction, it may. *Dana* v. *Nelson*, 1 Aik. 252. Again, the fact that the Legislature intended such property to be available for payment of such debts would be a reason why the court should not aid bondholders to defeat it ; and again, if these orators were entitled to hold the property by attachment at law, the bondholders cannot take them into a court of equity without affording them as full relief there ; and again, the remedy by attachment could not be exclusive. *Malone* v. *Shamokin Valley & Pottsville Railroad Co.* 31 Leg. Int. 260 ; *Fox* v. *Seal*, 22 Wal. 424.

The debts evidenced by the notes are still a lien. *Lewis* v. *Starke*, 10 Sm. & M. Ch. 120, and other cases.

The claims for stationery, printing, &c., and for telegraphing, and the claims of the members of the executive committee, of the superintendent, of the president of the Lamoille Valley Railroad Company, of the chief engineer, and of attorneys come within the statute, and should be allowed.

*B. F. Fifield*, also for the orator.

The agreement for the precedence of the bonds issued under the preference mortgage operated a mortgage or equitable assignment of the first-mortgage interest to the extent to which the holders of first-mortgage bonds signed it. 1 Jones Mortgages, ss. 162, 188 ; Jones Railroad Securities, s. 75.

The claims under the cross-bill that are evidenced by notes are not secured by any lien, as the taking of the notes operated payment and waiver of the lien. Jones Railroad Securities, s. 582 ; *Hutchins* v. *Olcutt*, 4 Vt. 549 ; *Beech* v. *Canaan*, 14 Vt. 485. The claims not for materials, &c., for keeping the roads in repair, are not. Gen. Sts. c. 28, s. 102.

The statute created no lien, but an exemption in favor of a certain class of creditors, which they might enforce or waive, as they

pleased. Had an attachment been made before the receivers were appointed, they might have perfected a lien, but they lost in the race of diligence. *White* v. *Fuller*, 38 Vt. 193, 202 ; *Paige* v. *Smith*, 99 Mass. 395. But it is said that the earnings of the roads have been appropriated to the making of repairs, &c., so that the mortgage security has been enhanced, that the earnings while in the possession of the company are a kind of trust, and that the mortgagee is entitled to his interest, only out of net earnings. There are, however, no proceeds in the hands of the court ; money did not go to the mortgagees ; it does not appear that anything but net earnings were used in construction. *Douglass* v. *Cline*, 12 Bush, 608, and the other case cited are therefore distinguishable. See Jones Railroad Securities, s. 559 ; *Galveston Railroad* v. *Cowdrey*, 11 Wal. 459.

The opinion of the court was delivered by

POWERS, J.   On the 1st day of May, 1871, the Lamoille Valley Railroad Company, the Montpelier & St. Johnsbury Railroad Company, and the Essex County Railroad Company, associated together for the purpose of building a railroad from the Connecticut River to Lake Champlain, and known as the Vermont Division of the Portland & Ogdensburg Railroad Company, in order to raise money to construct, complete, and equip their railroad, executed to Luke P. Poland and Abraham T. Lowe, as trustees, a trust deed of their railroad, including all its real and personal property, together with the tolls and income and all their corporate rights and franchises, in trust to secure the payment of $2,300,000 in joint bonds issued by said companies, with semi-annual interest coupons attached. In the habendum it is stipulated that the conveyance is made and accepted upon trusts, and subject to limitations and conditions,

*First*, to secure the payment of the principal and interest upon the joint bonds ratably and without preference, &c., and further as follows :

*Third.* Upon trust until default shall have been made by the parties of the first, second, and third parts in payment of the principal or interest of said bonds, or some of them, or until de-

fault shall have been made in respect to something herein agreed or required to be done by them, to suffer and permit the said parties of the first, second, and third parts to possess, use, occupy, manage, and operate the said railroad property, franchises, and appurtenances, and to renew, replace, and repair the said property and every part thereof, and take, receive, and use the tolls, rents, issues, incomes, and profits thereof, and apply the same to the payment of the current expenses of the roads, and to the purchase of necessary machinery and equipment, or dispose of the same for the lawful uses of the said parties of the first, second, and third parts, in any manner not inconsistent with this indenture. And the boards of directors of said several companies may likewise distribute and pay any net annual incomes to stockholders, after providing for the interest on any and all bonds which said companies may owe.

*Fourth.* Upon trust that in case the said parties of the first, second, and third parts shall fail, neglect, omit, or refuse to pay the principal of, or the interest upon, the said bonds or any thereof, as the same shall respectively become due and payable, and such failure, neglect, omission, or refusal shall continue for the period of four months after the payment thereof shall have been demanded in writing, then the said parties of the fourth part, or either of them, upon the refusal of the other or their successors in said trust, may by themselves, or their attorneys, agents, or servants in that behalf, upon the written request of the holders of a majority in amount of such bonds then outstanding in respect whereof there shall have been any such failure, neglect, omission, or refusal, enter into and upon, and take possession of, all, or, in their or his discretion, any part of the said premises and property hereinbefore described, and work and operate the said railroads and receive the income, receipts, and profits thereof, and out of the same pay : 1st. The expenses of running and operating the same, including therein such reasonable compensations as they or he may allow to the several persons employed or engaged in running and superintendence of the same, and all taxes, assessments, charges or liens having priority or preference to the lien of these presents upon the said premises, or any part thereof, and a rea_

sonable compensation to the parties of the fourth part, or their successors, or such of them as shall act in the premises, for their or his care, diligence, and responsibility in the premises, and for the services of such attorneys and counsel as may have been by him or them employed, and also the expenses of keeping the said roads and appurtenances, the locomotives, and rolling stock thereof in good and sufficient repair, &c.

Under the sixth trust specified the trustees were empowered, after a default for six months, and on request of the holders of three fourths in amount of outstanding bonds, to take possession and sell the mortgaged premises at auction. On the 1st day of April, 1874, said companies executed a second mortgage of the same property to the same trustees, to secure the payment of joint bonds to the amount of $1,770,000, and upon the same trusts as those expressed in said first mortgage. About $125,000 only in bonds were issued under this mortgage. On the 1st day of January, 1875, said companies, jointly with the Lamoille Valley Junction Railroad Company and the Maine Division of the Portland and Ogdensburg Railroad Company executed a third, called a consolidated, mortgage of their several railroads to said Poland and Israel Washburn, Jr., and P. H. Brown, as trustees, to secure the joint bonds of all said companies, to the amount of $9,500,000, and upon like trusts to those expressed in said first mortgage. About $80,000 of this class of bonds were isssued. The first named three companies, having expended the proceeds of all said bonds and being insolvent, and said second and said consolidated bonds being unsalable, and the sum of $500,000 in money being necessary to complete their railroad, on the 18th day of July, 1876, executed a fourth, called a preference mortgage of all the property, rights, tolls and income described in said first mortgage to said Poland, trustee, in trust to secure the payment of $500,000 in joint preference bonds, issued by said companies, and upon the other trusts expressed in said first mortgage. And it was provided in said last-named mortgage that no bonds should be issued under it, until the holders of first-mortgage bonds to the amount of eighteen hundred thousand dollars, should have signed an agreement in writing, in the following words, to wit: " We,

whose names are hereto subscribed, holders of bonds of the numbers and amounts set against our respective names, issued under, and secured by, the first mortgage of the Essex County Railroad Company, of the Montpelier and St. Johnsbury Railroad Company, and of the Lamoille Valley Railroad Company, hereby severally agree that for the purpose of completing and equipping the line of the said several roads to Lake Champlain, in Swanton, Vt., under existing contracts or otherwise, and of paying the interest on the debts, for the payment of which a portion of such bonds are pledged, the said several railroad companies may issue bonds to be denominated preference bonds, in character like the first-mortgage bonds, to the amount of five hundred thousand dollars, secured by a joint mortgage of the several railroads and their equipment like unto the first mortgage thereof, which shall constitute and be a lien on the same prior to the bonds held by us severally, the mortgage and bonds to be made to Hon. Luke P. Poland as trustee; said preference bonds to be payable, principal and interest, in gold, in twenty years, and at the option of said companies after five years from the 1st day of May, A. D. 1876, and to bear interest at the rate of six per cent. per annum semi-annually. This agreement and consent is not to be binding until the holders of the first mortgage bonds to the amount of eighteen hundred thousand dollars shall execute the same, nor until the trustee in the preference mortgage, being one of the trustees of the first mortgage, shall consent hereto in writing; said preference bonds are not to be pledged or sold for less than their par value without the consent of said trustee, and none of said bonds are to be issued by said trustee until he is fully satisfied that the said companies have made such arrangements and contracts that the issue of said bonds will accomplish the completion of the line to Lake Champlain, and that said companies will pay the interest on the debts for the payment of which the first-mortgage bonds are pledged, for at least two years from the date of the preference bonds." And the said paper was signed by the holders of first mortgage bonds, stating the numbers and denomination of the bonds held by each, to about the amount of eighteen hundred and seventy thousand dollars. And said Poland gave his consent as

trustee thereto in writing, as provided in said agreement.   Default
in the payment of interest upon the first-mortgage bonds was made
in May, 1876, and about that time upon all classes of said bonds,
and October 18, 1877, this bill was brought by the trustee under
said preference mortgage, asking to have the priorities of said
securities ascertained, an account of all said bonds taken, and for
a proper decree of foreclosure.   The bill also alleged that the
roads of said companies were very incomplete, and must soon
have a very considerable expenditure of money thereon, to run
with safety ; that said companies were largely indebted to many
persons, who were not secured upon the property, and that if said
roads remained in the hands of said companies, all the earnings
thereof and all the personal property would be taken for the pay-
ment of such debts and diverted from the payment of the interest
due to mortgage bondholders ; and that the orator, as trustee un-
der said preference mortgage, had wholly declined to take posses-
sion of said roads and run them, as trustee, as had the trustees
under the first mortgage, and that they regarded it " as simply
impossible for them so to do, without the greatest peril of pecu-
niary loss and ruin to themselves."   The bill also prayed that
the court would appoint some suitable person or persons as re-
ceivers to take possession of said roads and property, and operate
the same under the order and protection of the court until a final
decree should be made in the premises.

A cross-bill was filed by the trustees under the first mortgage,
with like prayer for relief.   The bill and cross-bill also contained
an allegation that the orator was informed and believed that said
companies, in running and operating their roads, jointly became
and were indebted for services and supplies furnished for such
purpose to various persons who claimed to have some kind of
equitable lien on the roads, or the personal property thereon, or
the earnings and income thereof, and that George E. Howe of
St. Johnsbury, Vt., and Capen, Sprague & Co. of Boston, Mass.,
claimed to be creditors of that class, and asked that they might
be made defendants, to represent their own claims and all others
having like claims.   Receivers were appointed October 18, 1877,
upon the filing of the original bill, who immediately took posses-

sion of all said property and still hold it. The original and cross bills were answered by the trustees and sundry bondholders under the consolidated mortgage, and by J. R. Nichols, a first-mortgage bondholder who did not assent to the preference mortgage, and by George E. Howe, Capen, Sprague & Co., unsecured creditors named in said bills. These creditors also filed a cross-bill, claiming a priority upon the personal property described in said mortgages, and upon the earnings of said mortgaged property, for the payment of their claims. This latter cross-bill was answered by the orator in the original bill, and by certain holders of first-mortgage bonds, denying all equity therein. It was also demurred to by sundry other bondholders. A master was appointed to take an account of the several classes of bonds, and an account of the debts of George E. Howe, Capen, Sprague & Co., and other creditors in said last-mentioned cross-bill named, and claiming to be preferred creditors. The cause was heard before a chancellor, at the June Term of the Court of Chancery of Caledonia County, and a *pro forma* decree entered upon said cross-bill of the trustees under the first mortgage, in favor of said trustees, for a foreclosure against the trustees and bondholders under said second and consolidated mortgages and said companies. And, in case such decree became absolute, the decree further ordered a foreclosure in favor of said trustee under the preference mortgage against said companies and such holders of first-mortgage bonds as assented to the preference bonds, unless said preference bonds be paid within a time therein limited, and further ordered that said trustee be subrogated to and hold all the right and interest of said assenting bondholders in said first mortgage, or the property covered by the decree of foreclosure upon said first mortgage, and further ordered that the cross-bill of the preferred creditors be dismissed. The trustees under the consolidated mortgage, J. R. Nichols, a non-assenting first-mortgage bondholder, and the preferred creditors appealed.

The first question presented upon this appeal is, whether the preference bonds are entitled to the priority which the parties concerned in their issue intended they should have. No one of the first-mortgage bondholders who assented to the issue of the

preference mortgage by the railroad companies, and who signed the agreement above recited, dated April 7, 1876, is here objecting to the priority now claimed for the preference bonds ; but they stand in court content to have the priority of the preference bonds accorded to them as agreed, and the duty of redeeming their interest in the first mortgage enjoined upon them as ordered by the decree below. The appellant Nichols claims that by the transaction resulting in the preference mortgage, the non-assenting first-mortgage bondholders *alone* now hold the security of the first mortgage. The trustees under the consolidated mortgage claim substantially the same thing. The bonds issued under the first mortgage share ratably and without preference in the mortgage security. The whole amount issued was $2,300,000. Those assenting to the preference mortgage in round numbers amount to $1,800,000, and the non-assenting to $500,000. The non-assenters, therefore, own five twenty-thirds of the first mortgage. Nothing can advance the fractional share of the non-assenters, except an extinguishment of the bonds of the assenters, or a cancellation of the security pledged for their payment. Neither event has transpired. The bonds are as valid now as before the execution of the agreement and the preference mortgage. The security of the first mortgage is still pledged for their payment, as before. No attempt was made—none could successfully be made—to give a priority to the preference bonds over those of the non-assenters, or, by a kind of tacking, to postpone the consolidated bonds. The assenters undertook to deal with their own bonds and security in a way to improve their value. If the assenters had pledged their bonds to A for collateral security, their ratable share of the first mortgage would go to the assignee. Leave the fact of the preference mortgage itself out of view, and suppose that the assenting first-mortgage bondholders, desiring to raise money to complete the road and thus make their security valuable, had loaned of A $500,000, and pledged their interest in the first mortgage as security, by an instrument as informal as the agreement in question ; would not a court of equity, as between the parties, treat the agreement for security as security ? That is precisely the effect of this agreement. The assenters said to the preference bondholders,

You lend your money to the companies to enable them to complete their road, and take their mortgage, which, as a lien upon the property, must be subject to all existing incumbrances, and we will give you, as a further security, our interest, or eighteen twenty-thirds of the first mortgage, as collateral. We will encumber that interest with the burden of your debt. We agree that your bonds shall be a prior lien upon the property. Is there anything in this transaction prejudicial to the rights of other parties interested in the property, or anything incapable of practical enforcement in a court of equity ? The preference bondholders did not lend their money upon the mortgage by the companies of a property already hopelessly buried under the load of three existing mortgages, nor on the credit of the insolvent companies. They demanded security, and the assenters undertook to give security. There can be, then, no question as to the *purpose* of the agreement. The agreement is, that the preference bonds shall be a lien upon the property prior to the bonds held by the assenters—not prior in time, but prior in order of payment. This agreement was incorporated into the bonds themselves and thus made them an equitable mortgage. Jones Railroad Securities, s. 75. A lien upon the property prior to the bonds of the assenters could only be created by subordinating their lien to the new lien, that is, by mortgaging the first as security for the second. There is nothing in the estate of a mortgagee that makes such a mortgage in equity invalid or impossible. Want of form is immaterial. Equity looks only to the substance, and so moulds that into form as to work out the intent of the parties. A mere agreement to give a mortgage is treated in equity as a mortgage. 1 Jones Mortgages, ss. 163, 167 ; Jones Railroad Securities, s. 73 *et seq*. Even if the agreement undertakes to mortgage a thing not *in esse*, equity will treat the contract as a mortgage when the thing comes into being, and charge it with a lien in favor of the party intended. Jones Railroad Securities, s. 122, and numerous cases there cited. When, therefore, the decree in favor of the first-mortgage bondholders becomes absolute, the assenters will hold their interest charged with the lien agreed to be given to the preference bonds. An equitable mortgage will not be upheld which

works a wrong to third parties, but where their interests are undisturbed, they are enforced for the purpose of executing the intent of the parties. *Miller* v. *Rutland & Washington Railroad Co.* 36 Vt. 452; Jones Railroad Securities, *passim*. To carry out the intent of the parties in this case works no wrong to the non-assenters, as they stand under the decree precisely as they would if no preference mortgage had been made; nor to the consolidated bondholders, as they must redeem only so much as they voluntarily assumed when they took their mortgage. The invalidity of the agreement is not urged by the party bound by it, and neither of the appellants ought to be heard to question it—much less to profit by it. By what system of logic is it established that this attempt to give security is to be held inoperative to effectuate the purpose intended, but operative to work a forfeiture of eighteen twenty-thirds of the first mortgage? What has occurred to advance the interest of the non-assenters from five twenty-thirds to twenty-three twenty-thirds of that mortgage? The transaction amounts to a mortgage, or it is altogether inoperative. By it the interest of the assenters either passed in pledge or did not pass at all. If it did not pass, it remains where it was lodged before, and the assenters still own their fractional share in the first mortgage. To say that a court of equity shall defeat the purpose of this scheme that was devised, and has been operative to make the first mortgage more valuable—the share of the non-assenters equally with the rest—and at the same time declare that by means of it, the share of the non-assenters, who have paid nothing, has been magnified four-fold, is a novel proposition to advance in a court of equity. All the advantage that the non-assenters can reap from the transaction is found in the increased value of their security.

The questions arising upon the cross-bill of George E. Howe and others are new in this State, but are of easy solution. These orators as a class are seeking to enforce a common right against a common fund which they claim is, in equity, chargeable in their favor. The bill is not multifarious, and these orators have a proper standing in court. They insist that the companies were indebted to them at the time receivers were appointed, for service

rendered and supplies furnished to the railroad, and that the seizure of the property by receivers has not defeated their right to charge the chattel property and the net earnings of the receivership with the payment of their claims. They predicate their claim first upon sections 101 and 102, c. 28, Gen. Sts., which read :

" Section 101. All mortgages of railroad franchises, furniture, cars, engines, and rolling stock of any kind, when properly executed and recorded, shall be effectual to vest in the mortgagee a valid mortgage interest in and lien upon all such property without delivery or change of possession ; and for the purpose of mortgage, all such property shall be deemed part of the realty.

" Section 102. Provided, nothing in the preceding section shall prevent such furniture, cars, engines, and rolling stock, from being attached by any person having a claim against the corporation owning such property, for an injury sustained on the road of said corporation by reason of any neglect of said corporation, or *for services rendered or materials furnished for the purpose of keeping said road in repair, or in running the same,* or for any liabilities as common carriers, or for the loss of any property while in the possession of said corporation ; and such property, when so attached, may be taken, held, and disposed of in the same manner as it could have been if that section of this chapter had not been passed."

At the time the several mortgages above described were executed, we had no law in this State authorizing the execution of chattel mortgages, and but for this section (101) such mortgage of chattel property by railroad companies would be invalid as against creditors and purchasers. To obviate this embarrassment section 101 was passed, enabling railroad companies to make a valid mortgage of personal property. But section 102 is a proviso to section 101. The intent of the section is that such a mortgage shall be inoperative against the liabilities specified. It affirms the right to attach the chattel property, and hold and dispose of it in the same manner it could have been done if that section had not been passed. If that section had not been passed such mortgage, without change of possession, would be void as to creditors.

As against the preferred creditors, the property remains unincumbered by the mortgage. This statute was in force long before the execution of the mortgages hereinbefore described. The bondholders, therefore, took their security with notice of its subordination to the rights of such claimants. In view of the necessity of a change of possession to make such a mortgage effectual, it is clear that no court of equity would undertake by means of a receivership to seize the property and give to the mortgagee a possession that would or could operate as a substitute for the possession required by the statute, especially upon the ground avowed in this bill, that the trustee cannot afford to take possession, and asks the court to do so to prevent the exercise of this very right of attachment which is accorded to these creditors. Such a proceeding would work a nullification of the statute—it would be an attempted overthrow of a legal right and priority which no court has the power to accomplish. The doctrine is elementary that the appointment of a receiver alters no existing rights in respect to the property seized. It merely stays the enforcement of rights by the parties in interest for the time being. It operates like an injunction *pendente lite*. By the terms of the deed of trust, the trustee, upon default in the payment of interest on the bonds for four months after demand, and on request of a majority of the bondholders, was empowered to take possession of the property, run and operate the road, and take the income. Counsel argue that this entry into possession was accomplished by the creation of the receivership, that the receivers are holding for the mortgagees, that the receivership was the result of a " race of diligence " between the bondholders and these creditors, and that the only right accorded the creditors by the statute was the right to attach the property, if by diligence they could reach it before the bondholders seize it. Whatever might be claimed for a possession by receivers, established upon other grounds, it is obvious that in this case they do not hold solely for the mortgagee. The authorized representative of the bondholders declined to take possession under his mortgage right. He implored the court to take possession, not for him nor those he represented, but to prevent these creditors getting in, and asked the court to hold the possession, and

operate the road by receivers until a final decree be made in the premises. The receivers hold for whom it may concern. The creditors are made parties defendant to the bill and cross-bill, they are asked to set forth and litigate their right, they have done so upon proper averments and proofs, and upon answer made to their claim. The final decree, therefore, " which shall be made in the premises " will determine the priority to this chattel property, which, among other things, the court is asked to seize. The receivers hold for the contending parties—for the creditors as well as all others interested. Although the statute accords the right of attachment—a right merely to proceed at law—still, this right is to have effect in equity if the creditors standing upon it are summoned to that forum to establish it. It verges upon serious trifling to say to these creditors, you ought to have attached this property, and not slept upon your rights a year or more until the court seized it. It is subjecting the valuable substance to technical mode and form, and enabling crafty vigilance by the aid of the official signature of a chancellor to place that valuable substance beyond the reach of those entitled to it, not by any adjudication that changes the character of the right itself, but a change of venue that renders the statutory remedy technically improper in the new posture given to the property. Section 102 makes the chattel property attachable on a claim for a personal injury on the road. If A receives a severe injury by the gross negligence of the company, could the company screen the property from liability by a " change of ministry " ? Could the bondholders wrest the property from liability by securing receivers upon an *ex-parte* application and hearing, before A had even had time to take out process ? Is this new way of paying old debts to receive the sanction of a court of equity ? The right to attach the chattel property exists now as perfectly as before the appointment of receivers, but the court adjudged that the best interest of all concerned would be subserved by enjoining the exercise of the right, and having so determined, it is not supposable that the court would surrender the property to an attaching officer now, thus ending all occasion for a receivership. The litigation of this question having begun in equity, and the court having assumed the handling

and custody of the property, the case will be retained in that court for the final determination of all questions arising under the claim of any party interested. These creditors having a priority of legal right and the creation of a receivership conferring no new rights upon the mortgagees, it is for the court to give effect to this priority in the administration of the property. The receivership is to be made chargeable, as holding the chattel property subject to the prior right of these creditors to have it made answerable to their claim.

The master's report shows that the chattel property, when taken by the receivers, was worth enough to satisfy these preferred claims. It has been used in the operation of the road, and, consequently, some of it has been consumed and destroyed, and all of it much worn and depreciated in value. Other property of like kind has to some extent been supplied in its place, but this is not all available to these creditors. The property taken by the receivers was ample security for the payment of these creditors. The receivership must be made debtor accordingly, and held to respond from such resources as it has, properly applicable for that purpose. The ground of the application for the receivership was, the danger that these creditors would attach the chattel property, and that all its earnings and the earnings of the road would be taken to pay the unsecured creditors. This application could have been fully answered by an injunction. In that case, security for consequential damages would be furnished by bond, and the property would have remained in the custody of the mortgagor, pending the proceedings to foreclose. The receivership without bond of indemnity cannot be permitted to operate differently upon the claims, rights, and interests of the unsecured creditors from an injunction, nor work a greater embarrassment upon the assertion and realization of such claims, rights, and interests.

We have thus far considered the equity of these creditors to have this chattel property made available to them, as flowing from the priority given them by the statute in question. But there is another ground, equally tenable, upon which the receivership is equitably bound to respond by applying the net income of the railroad property in payment of these debts. As we have seen,

this mortgage is made upon the trust that until default made in the payment of interest, the mortgagor shall remain in possession, operate the road, take the tolls, rents and income, *and apply the same to the payment of the current expenses of the road, or dispose of the same for the lawful uses of the mortgagor.* The mortgagees took their security burdened with this trust. The claims of these creditors are " current expenses of the road." They should have been paid by the mortgagor out of earnings. If the earnings had been kept intact, and, on the appointment of receivers, had been delivered to them in cash, would not a court of equity order that they be first applied in satisfaction of all back arrearages of expenses incurred by the mortgagor in the operation of the road ? The mortgagees could not object, because they agreed that these earnings should be so applied. The receivership altered no rights in this respect, unless the doctrine that the " race of diligence " gives to the mortgagees earnings that they have agreed belong to other parties, can be upheld. The mortgage of the tolls and income does not give these · earnings to the mortgagee—all that passes under such a mortgage is net income. Income means what is left after paying the expenses of earning income. The trustee declines to take possession, and asks the court to exercise an unusual and extraordinary jurisdiction in appointing receivers. Seeking equity, he must do equity. The court might at the outset make it a condition in the appointment of receivers that these debts should be paid, or require security for them to be furnished, or the order can be made at any later stage of the proceedings. *Fosdick* v. *Schall*, 9 Otto, 235 ; *Ellis* v. *Boston, Hartford & Erie Railroad Co.* 107 Mass. 1; *Douglass* v. *Cline,* 12 Bush. 608; *Duncan* v. *Ches. & Ohio Railroad Co.* 15 Am. Law Reg., N. S. 428, and many other cases. No case has been cited to the contrary, and probably none can be found. By the terms of the mortgage, the mortgagor was bound to pay these debts from current earnings. The mortgaged estate is now equitably indebted for the same. It would be highly inequitable for the receivers to take the estate, relieved of this equitable burden. Until the mortgagee takes possession of the road he has no right to its earnings superior to the mortgagor. The earnings follow the possession. Whoever holds possession of

23

the thing that makes earnings, takes the earnings made. Here the receivers hold possession for all parties in interest. The parties in interest are the mortgagees, the mortgagors, and these preferred creditors, and the receivers must distribute net earnings among these parties, as their respective equities may appear. A large amount of net earnings has already been expended in making new road, thus enhancing the value of the property as a security for the bonded debt. This chattel property, upon which these creditors have a claim paramount to the mortgagees, has been used and much of it worn out in making this net income so expended. After default in payment of interest, the mortgagor was suffered to remain in possession, and incur the debts of these creditors in repairing the road and in running it in the fulfillment of its duties to the public. Can it be said that the mortgagees shall now be permitted to say that they have a superior equity to take the benefits of these services, take the use of this chattel property, and take the increased value of their security, without obligation to do equity ? Can they return the chattel property in its depreciated condition in full satisfaction of the claims of these creditors upon it ? The mortgagor has no equity to the net earnings. The question, then, is limited to the relative rights of the mortgagee and these creditors. As between these parties, under the circumstances of the case, it is beyond question that the receivership is bound to apply its net income first to the discharge of these claims. It is to be noted that this application of net income is merely paying an obligation that equitably rested upon a portion of the property seized by the receivers, and which has been largely consumed to the advantage of the mortgagee, and thus consumed upon the mortgagee's express *request*, and that net income is the only resource in the first instance that is properly applicable to the discharge of any debt of the receivership except expense of operation. The Supreme and Circuit Courts of the United States have repeatedly promulgated this doctrine, and the highest courts of many of the States have concurred in it. See cases *supra.* If any case denies the doctrine, it has not been shown to us.

What creditors under the statute have this preferred right to

attach this chattel property ? It is clear that construction expenses are excluded in section 102. It is clear that general creditors are excluded. The statute (section 101) makes the mortgage valid against all creditors, except those especially enumerated in section 102. Every liability specified in section 102 grows out of the actual operation of the road. It is a matter of general notoriety that the construction and operation of railroads give rise to great conflicts of interest between security-holders, which portend imminent peril to the wages of employes. This statute was intended as a protection to them. It was the purpose of the Legislature to protect a class of employes who could not protect themselves. The protection afforded, however, is in derogation of the rights of other creditors, and therefore cannot be extended by construction beyond the class of creditors specified. *Lehigh Coal & Navigation Co.* v. *Central Railroad Co.*, 2 Stewart, 252 ; *Pennsylvania & Delaware Railroad Co.* v. *Leuffer*, 84 Pa. St. 168. In nearly all the States, statutes of similar import exist, all having the same object of giving protection to a class of operatives, who, scattered along the line of a railway, are engaged in a service that precludes sharp watchfulness over the solvency and honesty of their employers, and lack the means and opportunity of guarding their own interests. The master has made a list of claims for services rendered and materials furnished in repairing and operating the road. Some of the claimants named in this list might, from the duties they are generally understood to perform, be properly excluded from the preference accorded by the statute, such as the cashier and paymaster, and perhaps some others. But the difficulty is, that although the mortgagees interested to defeat the allowance of these claims, appeared before the master by counsel, and made specific objection to many claims, yet, so far as appears, they made no objection to any claim enumerated in this list. No exception to the report raising any question upon this list of claims has been filed. No suggestion is made, in brief or argument, by any of the numerous counsel who have been heard, that this list of claims included any claimants not entitled to share in the privilege given by the statute. It is not the business of the court to purge a list of claims that the par-

ties do not question, but we are to treat it as the parties treat it, namely, as conceded to be correct. Some of the claimants have taken promissory notes for the amount of their debts. Taking a note for an antecedent debt is in this State presumably a payment of the debt; but the question is one of intent. If the debt is one that carries a security or priority, it is not to be presumed that a mere change in the form of the indebtedness was intended to defeat its priority, when the debtor is confessedly insolvent. The statute must be construed in a way to carry out the intent of the Legislature. When, therefore, it accords a priority to claims for " services rendered or materials furnished for the purpose of keeping said road in repair or in running the same," it is not to be extended beyond the obvious import of the language used. Services rendered in keeping the road in repair might be construed so as to include the officials of the road, but it was the intent of the Legislature to include only such persons as were engaged in manual labor in making repairs. Services rendered in running the road includes the same class of operatives and employes. The dividing line is between services rendered in the official and executive management and authority over the work of making repairs and running the road, and such laborers and employes as do this work. The employers are excluded, the employes included. Such is the rule adopted in other states having similar statutes. Thus directors are excluded. The superintendent, who is an employe in his relation to the corporation, is an employer in his relation to the work of repairing and running the road. He is the *alter ego* of the corporation itself. He is not within the privilege of the statute. Jones Railroad Securities, s. 580. Nor is the civil engineer. *Pennsylvania & Delaware Railroad Co.* v. *Leuffer, supra; Brockway* v. *Innes,* 39 Mich. ; Jones Railroad Securities, s. 580. Nor heads of departments, general agents, and attorneys, Jones Railroad Securities, *supra,* and as the latter claimants cannot gain a priority over general creditors for their services, they cannot gain it for rent of offices and stationery used, or telegraphing ordered by them. Such expenses are usual and proper in the operation of a railroad, so are the services of directors and attorneys, but they are general debts of the cor-

poration. It is said that the charges for printing tickets, bill-heads, posters, time-tables, &c., ought to be treated as materials furnished in running the road. It would be rather difficult to classify such supplies as materials furnished for keeping the road in repair. The word materials has substantially the same meaning when used in connection with the work of repairing, that it does in the work of running the road, and means such supplies as are indispensable in making repairs upon the road or its equipment, and are annexed to the property and become part of it, or are consumed by it, in its use, such as iron, ties, lumber, wood, coal, oil, &c. The same word is used in the statute giving a lien upon buildings, steamboats, mills, factories, machinery, &c., to mechanics and material-men. The statute creating mechanics' liens belongs to the same class of legislation as the statute in question. It has the same general object, applies to the same class of persons, and works out substantially the same relief. The mechanic has a lien by law, provided he follows it by his attachment of the property. The railroad employe has a lien by law, if he first makes attachment and thereby creates it. In the latter case, a lien upon the road-bed and superstructure would be of little value to the creditor, and hence the right to acquire it by attachment is limited to such property as can be made practically available.

The ground and reason of giving to a creditor who has furnished materials for repairing, erecting, or operating a factory a lien upon it or its machinery, is, that such supplies have been incorporated into the building, and thus not only lost their identity. as chattels, but have increased the value of the principal thing to which they are annexed. *Stout* v. *Sawyer*, 37 Mich. 313 ; *Grosz* v. *Jackson*, 6 Daly 463. Phillips Liens, *passim*. If a printer who supplied posters and tickets to officials running a steamboat or a theater, could fasten a mechanic's lien upon the boat or building, upon the theory that he had furnished materials for such structures within the meaning of the statute, he could gain a like priority in this case. Such is not, however, the construction given to this word as used in the statute relating to mechanics' liens, and it ought not to be so construed in the statute in ques-

tion. The word made use of (*materials*), looked at in connection with the general purpose of the statute, clearly refers to supplies of a different nature from printers' bills or printed matter.

The decree below, dismissing the cross-bill of the preferred creditors, must be reversed, and such of them as have brought themselves within the statute, are entitled to relief.

In view of the condition of the road and its duties to the public and its security holders, a reasonable time should be allowed to the parties in interest to provide for the payment of these claims without serious embarrassment to the operation of the road, and failing to make such provision, the chattel property named in the statute should be sold under the order of the court, and the proceeds ratably applied in payment of these claims, and if any part thereof then remains unsatisfied, the net earnings of the receivership must be applied to extinguish the same.

The cause is remanded, with mandate embodying the views herein expressed.