[L. A. No. 4128. In Bank.—November 14, 1917.]

MERCANTILE TRUST COMPANY OF SAN FRANCISCO (a Corporation), Appellant, v. SUNSET ROAD OIL COMPANY (a Corporation), et al., Defendants; UNION OIL COMPANY OF CALIFORNIA (a Corporation), Respondent.

[L. A. No. 4152. In Bank.—November 14, 1917.]

UNION OIL COMPANY OF CALIFORNIA (a Corporation), Respondent, v. MERCANTILE TRUST COMPANY OF SAN FRANCISCO (a Corporation), Plaintiff; W. S. TEVIS et al., Appellants.

APPEAL—NEW TRIAL—GROUNDS.—An order granting a new trial in general terms must be sustained on appeal therefrom if there be any ground upon which it might properly have been made.

ID.—EVIDENCE SUFFICIENT — INCOMPETENT EVIDENCE RECEIVED WITHOUT OBJECTION.—Uncontradicted testimony, although incompetent, as hearsay, if admitted without objection, is sufficient to establish a fact.

MORTGAGE—CORPORATION BONDS—FORECLOSURE—NONPAYMENT OF INTEREST—ACCELERATING MATURITY OF PRINCIPAL—PRESENTMENT OF COUPONS — HEARSAY EVIDENCE — NEW TRIAL.—Where a complaint

for the foreclosure of a trust deed by way of mortgage securing bonds of a corporation alleged, in substance, that, under the provisions of the trust deed, the trustee had declared the principal of the bonds immediately payable for a default in payment of interest continuing for the period prescribed in the mortgage after demand of payment, and the evidence tending to show presentation of the interest coupons for payment, if objected to, might have been excluded as hearsay, but no. objection to that evidence was made or suggested at the trial except by a motion for nonsuit, which was made upon grounds not sufficiently specific to direct the attention of court or counsel to the precise point, an objection, raised in the supreme court on appeal, based on the failure to produce the best kind of evidence will not justify the granting of a new trial.

ID.—DEFAULT CLAUSE CONSTRUED—FORECLOSURE BY SUIT.—Provisions in a trust deed, securing the bonds of a corporation, providing in substance that if default in payment of principal or interest should continue six months after presentment for payment, the trustee might take possession and declare all sums secured immediately payable, and further, that if the principal should become due or should have been declared due, and such default should have continued for six months, the trustee might take possession and sell and foreclose, and a further declaration that the "foregoing provisions" for foreclosure and sale "shall be in addition to the ordinary right of foreclosure by entry, by suit, or by action," do not mean that, after the option to declare the principal due for a six months' default in payment of interest has been exercised, a further period of six months must elapse before a right of foreclosure arises, it being plain that there was no intention to limit the ordinary right of the mortgagee to resort to the courts for relief, whenever the principal sum was overdue and unpaid.

ID.—LEASE SUBSEQUENT TO MORTGAGE—EFFECT OF FORECLOSURE.—A lease of mortgaged property, executed subsequently to a mortgage or trust deed, will be cut off by a foreclosure sale under the mortgage, in the absence of equitable grounds sufficient to overcome the legal status given to the mortgage by its priority.

ID.—CONTRACTS—EXECUTION—AGREEMENT INTENDED TO BE REDUCED TO WRITING—FAILURE TO EXECUTE.—Where it is a part of the understanding between parties that the terms of a proposed compact are to be reduced to writing, assent to its terms must be evidenced in the manner agreed on, or it does not become a binding or completed contract.

ID.—ESTOPPEL—SUBORDINATING LIEN OF MORTGAGE TO LEASE.—A proposed lessee, learning that there was an outstanding bond issue, refused to take the lease unless the bondholders would subordinate their bonds and mortgage to the lease, and, in order to comply with this condition, drafts of papers were prepared and submitted, which

clearly contemplated that any arrangement finally made was to be evidenced in writing to be executed by the trustee under the mortgage, who also insisted, as a condition, that the assent in writing of all the bondholders should be obtained, but the lessee, having gone into possession, before all the bondholders had agreed in writing to this arrangement, there was no valid lease, and the trustee and bondholders were not estopped from asserting the priority of the bonds and the mortgage.

ID.—ESTOPPEL IN PAIS—RELIANCE ON REPRESENTATIONS.—It is of the essence of an estoppel *in pais* that the party asserting such estoppel should not only have been ignorant of the true state of facts, but that he should have relied upon the representation or admission of the adverse party.

ID.—PLEADINGS AND EVIDENCE.—Record examined and found without foundation for the claim of an estoppel, based upon the execution of a lease, and the taking of possession thereunder, and the expenditure of large sums of money, upon the faith and belief, induced by the acts and representations of the bondholders and the trustee that the right of foreclosure would not be exercised to the detriment of the leasehold interest.

AMENDMENT OF PLEADINGS — POWER OF COURT ON MOTION FOR NEW TRIAL.—A court does not exhaust its power to grant leave to file an amended answer and cross-complaint by denying the application at the trial; it may, on motion for new trial, reconsider its ruling and consider that a contrary ruling would be proper.

APPEAL—NEW TRIAL—ERROR IN REFUSING LEAVE TO AMEND PLEADINGS.—Where a court on the trial of an action refused leave, which it might properly have granted to a defendant, to file an amended answer and cross-complaint, and its refusal could have been in any way prejudicial to the defendant, and the same court subsequently grants a new trial, the supreme court must assume on appeal that the new trial was granted for that reason, and affirm the order.

MORTGAGE—FORECLOSURE—PLEADINGS—CROSS-COMPLAINT—CLAIM OF ADVERSE TITLE.—In a suit to foreclose a mortgage, a lessee of the mortgaged property cannot by cross-complaint set up a claim of adverse title.

ID.—CORPORATION BONDS—EQUALITY OF LIENS OF BONDHOLDERS AS BETWEEN THEMSELVES.—Where some of the holders of bonds, secured by a trust mortgage, had assented to an agreement subordinating their lien to a subsequently executed lease, and some had not so assented, the court, in a foreclosure suit, could not order the property sold in parcels until sufficient proceeds were realized to pay the nonassenting bondholders, and then allow the rest to be sold subject to the lease, such a sale being in violation of the right of all bonds to share equally in the security, and giving a part of them a prior lien on at least some of the property.

New Trial—Limitation on Discretion of Trial Court.—The wide discretion allowed to the superior court on motions for new trial will not justify the granting of such a motion where, in the findings and judgment, the court reached the only conclusion which it could properly have reached on the record.

APPEALS from orders of the Superior Court of Kern County granting a new trial. Howard A. Peairs, Judge.

Morrison, Dunne & Brobeck, A. E. Shaw, Gavin McNab, and R. P. Henshall, for Appellants.

Lewis W. Andrews, Thomas I. Toland, and Andrews, Toland & Andrews, for Respondent.

SLOSS, J.—The action was brought to foreclose a mortgage or trust deed made by Sunset Road Oil Company to the plaintiff to secure an issue of bonds. Its general features are set forth in our opinion in *Mercantile Trust Co. of San Francisco* v. *Sunset Road Oil Co., ante,* p. 451, [168 Pac. 1033], where the appeal was from an order, made in the same case, granting the motion of the Kern Valley Bank and the superintendent of banks for a new trial.

One of the defendants named in the complaint was Union Oil Company of California. It filed its answer and a cross-complaint.

The interest asserted by the Union Oil Company is based on a lease from Sunset Road Oil Company to it of the major part, if not all, of the property covered by the trust deed. This lease bore date December 10, 1908, and was recorded December 31, 1908, long after the execution and recording of the trust deed. Under this lease, which was for a term beginning with its date and ending with the close of the year 1928, Union Oil Company went into possession of the demised premises, and expended large sums of money in their development and operation as oil-producing lands. Its sole concern in the litigation is the protection of its possession as lessee. The mortgage was prior to the lease, and, in the absence of equitable grounds sufficient to overcome this legal status, a foreclosure sale would, of course, end the leasehold interest. (*McDermott* v. *Burke,* 16 Cal. 580.) The effort of the Union Oil Company was to prevent such foreclosure,

or to secure, in some form, an adjudication that, by reason of certain transactions which we shall outline, its rights under the lease were entitled to protection even if a foreclosure should be had. With respect to the right to foreclose at all, the Union Oil Company, by denials in its answer, made the claim that there had not been, at the time of the institution of the action, such a default as would authorize foreclosure proceedings. Its contention that its rights as lessee should be recognized and protected, notwithstanding a foreclosure, was based upon the claim that the plaintiff, Mercantile Trust Company, and all the bondholders had agreed, prior to the execution of the lease of December, 1908, and the taking of possession thereunder, that all of such bonds should be subordinated to the rights of the Union Oil Company as lessee. It asserted that it had gone into possession and made large expenditures on the faith of this understanding, and claimed, by virtue of the alleged contract, and by way of estoppel, the right to have any sale on foreclosure made subject to its lease.

The findings of the court were against the claims of the Union Oil Company, and the judgment provided for a foreclosure and the distribution of the proceeds of the sale among the holders of all bonds, without in any way recognizing the alleged rights of the lessee.

Subsequently, the Union Oil Company made its motion for a new trial, which was granted, and from the order so made, an appeal (No. 4128) is taken by the plaintiff, and another (No. 4152) by the Sunset Road Oil Company, W. S. Tevis, and others. Both appeals will be discussed in this opinion.

The order granting the motion is in general terms. It must, therefore, be sustained here if there be any grounds upon which it could properly have been made. Although the voluminous record shows a great number of assignments of error, the substantial matters in controversy narrow themselves down to the two of which we have spoken, i. e., whether the right to a foreclosure had ripened at the time the complaint was filed, and whether the Union Oil Company had shown any ground upon which its right of possession as lessee might be held to have priority over the right of the plaintiff, or of the bondholders, to foreclose in such manner as to cut under the lease.

On the first of these questions, it may be remarked, incidentally, that no appeal was taken from the decree of foreclosure by the Sunset Road Oil Company, the mortgagor and owner of the property, and that the judgment has become final as to it. Assuming that the lessee of the mortgagor is in a position to make the point under discussion, it is quite clear, on the record, that there is no merit in the contention that there had not been such a default as to justify the institution of the action. The bonds of the Sunset Road Oil Company bore interest payable semi-annually, on the fifteenth days of January and July of each year, and bore coupons calling for the payment of such installments of interest. The amended complaint, which was filed in May, 1911, alleged a default in the payment of all interest coupons maturing on the fifteenth day of January, 1908, or thereafter. It further alleges that demands were made upon the plaintiff by holders of coupons for the payment of the same more than one year prior to the commencement of the action, but that the Sunset Road Oil Company has ever since failed and refused to furnish the plaintiff with funds for the payment of any interest or coupons. It is further alleged that on February 27, 1911, prior to the commencement of the action, the plaintiff declared the principal sum of the bonds immediately due and payable, and demanded payment thereof of the Sunset Road Oil Company, but said Sunset Road Oil Company neglected to pay the same or any part thereof.

These allegations are denied by the Union Oil Company. The findings in support of them are, however, fully sustained by uncontradicted evidence. The evidence tending to show presentation of coupons to the trustee for payment might, perhaps, if objected to, have been excluded as hearsay. Such objection was not, however, made, and it is well settled that incompetent evidence admitted without objection is to be regarded as sufficient to establish the fact. (*McCloud* v. *O'Neall*, 16 Cal. 392; *Curiac* v. *Packard*, 29 Cal. 194, 197; *Janson* v. *Brooks*, 29 Cal. 214, 223; *Williams* v. *Hawley*, 144 Cal. 97, 102, [77 Pac. 762].) The want of direct testimony of such presentation was not suggested at the trial except by motion for nonsuit, and the grounds of motion were not sufficiently specific to direct the attention of the court or of opposing counsel to the precise point now made. If they had been, the necessary proof would, in all probability, have

been supplied.  Under these circumstances, the failure to produce the best kind of evidence will not justify the granting of a new trial, where there is no evidence to the contrary.

The deed of trust provided that "if default shall be made in the payment of the principal or interest moneys mentioned in said bonds, . . . and if such default shall continue for the period of six months after the same, or any of them, shall have been properly presented for payment at the place provided therefor . . . , the trustee may . . . enter into . . . and take possession of all and singular the premises . . . , and may or shall declare all sums secured hereby to be immediately due and payable."  There is a further provision that in case the principal moneys shall have become or been declared to be due, and default made in the payment thereof, and such default shall have continued for a period of six months, then the trustee may take possession, and may foreclose the mortgage or deed of trust, and sell and dispose of all the rights, property, etc.  It is argued that, under these clauses, the option to declare the principal due does not arise until there has been a six months' default in the payment of interest, and that then a further period of six months must elapse before a right of foreclosure arises.  But the remedy contemplated by the later provision is a right of entry and sale by the trustee without judicial proceedings.  The instrument goes on to declare that "the foregoing provisions" for foreclosure and sale "shall be in addition to the ordinary right of foreclosure by entry, by suit, or by action."  It is plain, therefore, that there was no intention to limit the ordinary right of the mortgagee to resort to the courts for relief whenever the principal sum was overdue and unpaid. (*Toler* v. *East Tennessee Ry. Co.*, 67 Fed. 168, 179; *Farmers' L. & T. Co.* v. *Chicago & N. P. R. Co.*, 61 Fed. 543, 546; *Morgan's L. & T. etc. Co.* v. *Texas Cent. Ry.*, 137 U. S. 171, [34 L. Ed. 625, 11 Sup. Ct. Rep. 61]; *Guaranty Trust Co.* v. *Green Cove R. Co.*, 139 U. S. 137, 142, [35 L. Ed. 116, 11 Sup. Ct. Rep. 512].)

We pass to the consideration of the second and more important question, i. e., whether the Union Oil Company made out a case which, under any rational view of the evidence, would have justified the court in holding that its rights were superior to those of the plaintiff, as trustee, or of any of the holders of bonds.  While a great mass of testimony and docu-

mentary evidence was introduced, there is no substantial con-
flict upon the points which are material in this regard. The
following state of facts appears to have been established be-
yond question. Toward the end of 1908, the Sunset Road
Oil Company was in serious financial difficulties. Its proper-
ties were subject to this large bond issue, aggregating almost
one and one-half million dollars, it was in default in pay-
ment of interest on the bonds, it was in arrears on account of
royalties on a portion of its lands held under lease, it had a
large floating indebtedness, and its returns from the opera-
tion of its oil wells were not sufficient to enable it to meet any
substantial part of these demands, if, indeed, they equaled
the actual cost of operation. At this juncture, H. A. Blodget,
who was largely interested in the Sunset Road Oil Company,
and was one of its officers, opened negotiations with the Union
Oil Company, with a view to having the latter corporation
take a lease of the property and prosecute its active develop-
ment. The managing officers of the Union Oil Company ex-
pressed their willingness to take such a lease, but, being or
becoming aware that there was an outstanding bond issue,
stated that the Union Oil Company would not go on with
the proposed transaction, unless its possession as lessee were
protected as against the mortgage and the bonds secured by
it. This condition was acceptable to Blodget and his asso-
ciates, and steps were taken to procure the assent of the
various bondholders to an agreement making the bonds and
mortgage subject to or subordinate to the lease. At the out-
set, it seems to have been contemplated that the plaintiff, as
trustee, should execute some writing subordinating said mort-
gage to the rights of the Union Oil Company as lessee. The
trustee was approached, but did not state whether it would,
in any event, make such an arrangement. It did, however,
declare that an indispensable condition to its joining in the
plan, if it should join, would be the assent of the holders of all
bonds outstanding. While Blodget and his associates, among
whom was C. N. Beal, were endeavoring to get the various
holders of bonds to agree to the proposed arrangement, papers
were drawn for carrying the plan into effect. These in-
cluded, first, a form of indorsement to be made upon the
bonds, second, an instrument to be signed by the holders of
the bonds, for delivery to the trustee, and third, a notice to
be given by the trustee to the Union Oil Company when said

trustee should have received for indorsement all of the bonds, together with the instructions of the bondholders for their indorsement. It may be remarked that these papers plainly indicated that all of the outstanding bonds were to be delivered to the trustee and indorsed as provided, and that the royalties accruing under the lease were to be paid to the trustee. The papers were all sent to the Union Oil Company for its approval. They were held by that company for several weeks, and then returned, with a letter, under date of January 20, 1909, stating that the attorney for the Union Oil Company "reports that they are in satisfactory shape." The same letter states that the papers will be returned "in order that you may complete the work necessary to be done for the accomplishment of the Sunset Road Oil Company's lease to the Union Oil Company." The lease itself had been executed some time in December, and recorded on December 31, 1908. There is some evidence from which the court might have inferred that the execution and recording had taken place, in advance of the completion of the negotiations for subordination, at the suggestion of persons connected with the Sunset Road Oil Company. Be that as it may, it is entirely clear from the evidence that all parties contemplated that any arrangement finally made was to be evidenced in writing, and that the drafts submitted to, and subsequently approved by, the Union Oil Company constituted the form of writings by which this end was to be accomplished. It is elementary that where "it is a part of the understanding between the parties that the terms of their compact are to be reduced to writing and signed by the parties, the assent to its terms must be evidenced in the manner agreed upon, or it does not become a binding or completed contract." (*Spinney* v. *Downing,* 108 Cal. 666, [41 Pac. 797]; *Las Palmas etc. Distillery* v. *Garrett,* 167 Cal. 397, [139 Pac. 1077].) Until the return of the papers by the Union Oil Company the parties were still negotiating regarding the terms of the writings which were intended to ultimately embody the proposed agreement respecting the subordination of the bonds to the lease. These papers were never, in fact, executed, and it follows that no binding agreement was ever reached. The Union Oil Company did not, however, await either the execution of the writings or the ascertainment of the fact that they would not be executed. It went into possession on or about Janu-

ary 1, 1909, and immediately began the active prosecution of work under its lease. In the meantime, many bondholders had been approached by Blodget and Beal, and most of them had expressed their willingness to join in the proposed arrangement. Unquestionably, however, all of them contemplated, as did the Sunset Road Oil Company and the Union Oil Company, that any arrangement ultimately made should be embodied in writing, and their verbal assent neither bound them, nor did it afford to the Union Oil Company any justification for proceeding on the faith of a proposed or contemplated agreement which, as it knew, had not actually been made. It is true that in various letters to the Union Oil Company, Blodget or Beal expressed the confident hope that the assent of all bondholders would be obtained. There seems to be little reason to doubt their good faith in these expressions. But, as a matter of fact, they never did succeed in getting the unanimous action contemplated. The Kern Valley Bank was the holder of one hundred and ninety thousand dollars of bonds. While the evidence is not clear on the subject, there was some testimony to the effect that its managing officers had, at one time, expressed their willingness to join in the proposed agreement of subordination. But when it came to taking final action, which, as we have said, was to be in writing, they declined to go forward. The National Tube Company, holding fourteen thousand five hundred dollars of bonds, after hesitating for a considerable time, expressed its willingness to participate, but by this time the Kern Valley Bank had finally announced its refusal. There were other bondholders who, so far as the evidence shows, had never assented, and some of them had not even been approached. One of the holders, who had signed the proposed agreement, to be delivered to the trustee, had done so on the express condition that all royalties arising from the lease were to be paid to the trustee for the benefit of the bondholders, and this, as above stated, appears to have been a part of the general plan in contemplation. At any rate, the evidence leaves no room for doubt that the Union Oil Company, instead of awaiting the consummation of the proposed agreement, took the chance of going into possession and making large expenditures under its lease. Under these circumstances, the court could not have found that it accepted the lease, and went into possession under it, pur-

suant to an agreement on the part of the trustee and the holders of the bonds, that such bonds should be subordinate to the lease.   There is no evidence whatever that the trustee, plaintiff in the action and appellant here, ever assumed to make such an agreement, and, so far as the bondholders are concerned, the only agreement which any of them contemplated making was the written agreement which, as we have seen, was never consummated.

What we have said disposes, in effect, of the claim that these transactions afford a foundation for a claim of estoppel. It was, no doubt, the desire and expectation of the Union Oil Company that the proposed lease should be given a status superior to that of the trust deed and the bonds secured thereby.   But the Union Oil Company knew, as well as did the persons with whom it was negotiating, that the consent of the bondholders was necessary to the consummation of such an arrangement.   It was also known to all concerned that the plan in view was to be made effective by means of the execution of written documents.   The Union Oil Company executed the lease, took possession and began active operations with full information, not only that the writings intended to be signed by the bondholders and the trustee had not been signed, but that a number of bondholders had not even given an informal assent to the scheme of subordination.   On December 2, 1908, Mr. Stewart, an officer of the Union Oil Company, writing to Mr. Blodget, said: ''We are assuming that everything is going to be arranged satisfactorily between us and are therefore getting ready our force and equipment for the work in Sunset, but will spend no money until everything is buttoned up.''   On December 10, 1908, the lease was executed, and on the 17th of the same month it was ratified by the board of directors of the Union Oil Company.   On the eighteenth day of December, Mr. Blodget wrote to Mr. Stewart outlining the proposed plan, viz., to have all of the bonds, issued and to be issued, stamped with notice that they were subject to the lease, and ''when done'' to have the trustee advise the Union Oil Company.   The letter further stated that forms of agreement would be sent to the Union Oil Company as soon as settled, and that the trustee would instruct said Oil Company to pay all royalties to it. On December 24, 1908, Mr. Orcutt, of the Union Oil Company, wrote to Mr. Blodget, stating his understanding that

it would be necessary to have the bondholders or the trustee consent to the lease, and requesting that this work be hastened "as fast as possible, as we are anxious to enter into possession of the property." On December 26th, Mr. Beal, an officer of the Sunset Road Oil Company, wrote a letter to the Union Oil Company, saying, among other things, "The matter of securing the consent of the Sunset Road Oil Company bondholders to the lease is well under way, papers to carry the purpose into effect having been prepared by our attorneys and submitted to the trustee." On December 31, 1908, Mr. Beal again wrote to the Union Oil Company, inclosing the drafts of the three documents which were to be signed for the purpose of accomplishing the subordination of the bonds. It is perfectly evident that at this juncture the Union Oil Company was fully informed that the negotiations had not reached the stage of a binding or effective agreement. The letters to it conveyed direct information of this fact, and its own letters disclosed in plain terms its understanding that the steps required to protect it in its lease were being prepared, but that, in Mr. Stewart's phrase, everything had not been "buttoned up." Having full and accurate knowledge of the real situation, the Union Oil Company cannot claim to have been misled. It is of the essence of an estoppel *in pais* that the party asserting such estoppel should not only have been ignorant of the true state of facts, but that he should have relied upon the representation or admission of the adverse party. (*Boggs* v. *Merced M. Co.*, 14 Cal. 279, 367; *Raynor* v. *Drew*, 72 Cal. 307, [13 Pac. 866]; *Montgomery* v. *Keppel*, 75 Cal. 128, 133, [7 Am. St. Rep. 125, 19 Pac. 178].)

The evidence supplies a further answer, and a conclusive one, to the claims of contract and estoppel set up by the Union Oil Company in the pleadings upon which it went to trial. Those pleadings made no reference to any agreement subsequent to the Union Oil Company's taking of possession. Some of the cross-defendants set up in their answers a written agreement dated March 24, 1909, between W. S. Tevis, Union Oil Company, and Sunset Road Oil Company. This agreement recited the existence of the lease, that royalties would become payable from the lessee to the lessor thereunder, that the Sunset Road Oil Company's properties were subject to the mortgage here sued upon, under which one million

three hundred and sixty-two thousand dollars of bonds were outstanding, all of which "are now in default in interest payments," and that under the mortgage the bondholders might cause to be made a foreclosure, which, if made without the bonds being rendered subject to the lease, might cause the property to be sold free and clear of such lease. It further recited that Tevis owns or controls all of the bonds except two hundred and ten thousand dollars thereof, that the Sunset Road Oil Company has issued to the Union Oil Company, and the latter has accepted, an order directing the payment of all royalties under the lease, not theretofore disposed of, to Tevis. Following these recitals, Tevis agrees that he will cause all of the outstanding bonds, except the two hundred and ten thousand dollars, to be made subject to the lease, and to cause to be made upon each of them an indorsement in a prescribed form. He further agrees as to the two hundred and ten thousand dollars, that as long as he receives all royalties under the order accepted by the Union Oil Company, he will keep the interest paid on said two hundred and ten thousand dollars of bonds, so as to leave the holders thereof without grounds for foreclosure of the mortgage. The Union Oil Company accepts the order to pay all royalties to Tevis, and covenants and agrees to all the terms of the contract. This agreement affords convincing proof that the alleged agreement, subordinating the bonds to the lease, had not been made at the time of the execution of the lease, or the taking of possession thereunder. The recitals of the agreement of March 24th, which are binding between the parties thereto, show clearly the understanding of all of them that the bonds had not been made subject to the lease, and that it was desired to provide for their being so made. It cannot be justly claimed that the agreement of March, 1909, was a mere amplification or continuance of the alleged earlier agreement. The original negotiations contemplated the payment of royalties to the trustee, for the benefit of the bondholders, while under the later contract all royalties were to go to Tevis. Certainly the bondholders could not, without their consent, be bound by an agreement making so important a change in their rights, and it is not to be supposed that the parties to the contract of March 24th attempted to so bind them. The later writing must be regarded as a new agreement, binding

only on the parties to it, and independent of all prior transactions or negotiations on the part of others.

So, too, the written contract of March 24th furnishes an additional argument against the claim of estoppel. When it was made and signed, the Union Oil Company had already expended seventy-five thousand dollars upon the property. Obviously, the said company was not then relying upon any belief or understanding that the bondholders had theretofore bound themselves to subordinate their bonds, but was, on the contrary, bargaining for the covenant of Tevis that he would cause some of the bonds to be subordinated, and would, on certain conditions, pay interest on the rest. It is impossible to see, therefore, how the court could have made any findings in support of the positions asserted by the Union Oil Company in the pleadings upon which it went to trial. Those pleadings set up an alleged agreement by the trustee and all the bondholders, made at or prior to the execution of the lease, that, in consideration of such execution, the bonds should be, and were, made subordinate to the rights of the lessee. They further sought to set up an estoppel, based upon the execution of the lease and the taking of possession thereunder by the Union Oil Company, and the expenditure of large sums of money upon the faith and in the belief, induced by the acts and representations of the bondholders and the trustee, that the right of foreclosure would not be exercised to the detriment of the lessee's right of possession.

At the conclusion of the trial the Union Oil Company asked leave to file an amended answer and cross-complaint. The court denied the request, and this is one of the rulings assigned as error. The granting or withholding of permission to file amended pleadings rests largely in the discretion of the trial court, and its action will not be reviewed on appeal unless an abuse of discretion appears. But, we take it, the court has not exhausted its power to determine whether the interests of justice demand a granting of such leave by passing on the application in the first instance. It may, upon motion for new trial, reconsider its ruling, and conclude that a contrary ruling would have been proper. If the trial court might properly have granted leave to file the amended pleadings, and its refusal so to do could have been, in any way,

prejudicial to the respondent, we must, on this appeal, assume that the new trial was granted for this reason, and affirm the order.

We think, however, that the proposed amendments, if allowed to be filed, could not have availed the respondent. In so far as they sought to set up a claim of title adverse to that of the mortgagor, the issue tendered was not one which could be adjudicated in the foreclosure suit. (*Croghan* v. *Minor,* 53 Cal. 15; *Ord* v. *Bartlett,* 83 Cal. 428, [23 Pac. 705]; *Murray* v. *Etchepare,* 129 Cal. 319, 321, [61 Pac. 930].)   What we have said in our discussion of the questions of estoppel and agreement to subordinate furnishes a sufficient answer to the claim, asserted in the proposed amendments, that the respondent is entitled to a lien equal in rank to that of the mortgage for its expenditures under the lease.

It was also sought by the proposed amendments to set up rights under the contract of March 24, 1909. The amended cross-complaint, which the Union Oil Company asked leave to file, alleged that by virtue of this contract the bonds owned or controlled by Tevis ''are and should be held by the court to be subject to the rights of this cross-complainant under said lease.'' It further alleged that Tevis had failed to perform his agreement to keep the interest paid on the two hundred and ten thousand dollars of bonds not owned or controlled by him. The making of this contract had already been set up in the pleadings of some of the cross-defendants, who had alleged that the Union Oil Company had failed to perform the obligations imposed upon it under the agreement. The court found that the contract had been made, but declined to find on the issues relative to the performance of the obligations arising under it, deeming this controversy to be one not properly arising in the foreclosure suit, but to be determined in a separate action between Tevis and the Union Oil Company.

While the amended pleading offered for filing alleges that Tevis had not paid interest on the two hundred and ten thousand dollars of bonds, it fails to allege that the respondent had paid the accruing royalties to Tevis. His agreement bound him to keep the interest paid only so long as the royalties were paid to him. But apart from this, it goes without saying that, if in fact there was a default on the coupons,

there was no power in Tevis to waive or impair the rights which such default conferred upon the holders of bonds not owned or controlled by him. And his agreement did not assume so to do. We shall not stop to consider whether, by this contract, he undertook to accomplish a present subordination of the bonds which he did control, or merely promised to bring about that condition at some later time. It appears in the record that some of the bonds owned by Tevis did, in fact, bear an indorsement of subordination in the form prescribed in the agreement of March, 1909. We may, therefore, going beyond various objections of a more or less technical character which are urged against the proposed amended cross-complaint, proceed to a consideration of what is really the fundamental question on the merits of this litigation, i. e., whether the agreement on the part of the holders of some, but not all, of the bonds to subordinate their bonds to the rights of the Union Oil Company under its lease, could give to such lessee a right to resist foreclosure, or to obtain any of the relief sought by it in its pleadings.

The mortgage to the trustee was a single security in favor of all the bondholders. (*Dickerman* v. *Northern Trust Co.*, 176 U. S. 181, 206, [44 L. Ed. 423, 20 Sup. Ct. Rep. 311].) The mortgagor having defaulted, the nonassenting bondholders were clearly entitled to foreclose, and to have the proceeds of sale applied to the payment of their bonds. But the assenting bondholders were also entitled to subject the security to the payment of their bonds. As between the different bondholders, there were no priorities or preferences. Those who agreed to subordinate their bonds did not agree to surrender their lien upon the property mortgaged, or to make their bonds and liens subordinate to those of the nonassenting holders. As was said in a case presenting a similar situation, "The bonds are as valid now as before the execution of the agreement. . . . The security of the first mortgage is still pledged for their payment, as before." (*Poland* v. *Lamoille V. R. Co.*, 52 Vt. 144.) Accordingly, if there be any foreclosure, it must be a foreclosure for the benefit of all outstanding bonds entitled to share in the security. The court could not order the property sold in parcels until the nonassenting bondholders were paid, and then allow the rest to be sold subject to the lease. Such a sale would be in viola-

tion of the right of all bonds to share equally in the security, and would give to a part of them a prior lien upon some or all of the property. Furthermore, as we have already pointed out, if there were any sale of the property on foreclosure, such sale would necessarily terminate, as against the purchaser, the lease of the Union Oil Company. We see no possible way in which a court of equity could protect the rights of the lessee as against the holders of subordinated bonds, except, perhaps, by permitting the lessee to pay off the principal and interest due on all bonds not subordinated, and then directing a foreclosure, subject to the lease, for the benefit of the others. But if the Union Oil Company desired relief of this nature, it should have offered to make such payment. Its request for leave to file amended pleadings was made after the trial, when it conclusively appeared that a large amount of the bonds had not been subordinated to this lease. If it desired to obtain the opportunity of paying off the holders of bonds who were entitled to foreclose the mortgage without regard to its lease, it should have made an allegation of its willingness and ability to make such payment. Those who seek equity should offer to do equity. (*Bell* v. *Walsh*, 7 Cal. 84; *Buena Vista Fruit & V. Co.* v. *Tuohy*, 107 Cal. 243; [40 Pac. 386]; *Peshine* v. *Ord*, 119 Cal. 311, 314, [63 Am. St. Rep. 131, 51 Pac. 536].)

In *Poland* v. *Lamoille Valley R. Co.*, 52 Vt. 144, a railroad company had made a mortgage to secure an issue of two million three hundred thousand dollars, in bonds. It had also made a second and a third mortgage to secure other bonds. Thereafter, in order to obtain money necessary to complete its road, it had made a fourth mortgage of five hundred thousand dollars of "preference bonds." Under the last mortgage the preference bonds were not to be issued until the holders of one million eight hundred thousand dollars of the first mortgage bonds had agreed to make their bonds subject to the preference bonds. The requisite number did so agree; the holders of the remaining five hundred thousand dollars did not. In an action for the foreclosure of the various mortgages it was held that the first mortgage should be foreclosed, but that the one million eight hundred thousand dollars of bonds held by the assenting bondholders should be treated as a security in favor of the holders of the preference bonds. This case is cited by the respondent in support of its contention that it is entitled

to some relief as against the holders of subordinated bonds. The decision does not, however, meet the requirements of the present case. In the Vermont case it was distinctly held that the nonassenting bondholders were not entitled to any priority in the foreclosure of the security as against the assenting bondholders. The first mortgage had to be foreclosed for the benefit of all of the first mortgage bonds alike. But the preference bondholders held a subordinate lien on the same property, and in the enforcement of this lien, which was a proper subject for adjudication in the action, they were entitled to be subrogated to the position of the one million eight hundred thousand dollars of first mortgage bonds which had agreed that the preference bonds should have priority. All of the parties were creditors having claims secured by mortgage of the same property, and the question was merely as to the application of the proceeds of the security among the different creditors. Here we have an entirely different situation. Union Oil Company is not a creditor of the mortgagor, and has no lien upon the mortgaged property. It has a right, as against certain bondholders, that they shall not foreclose their security in such manner as to terminate its lease. But the security must be foreclosed in the interest of other bondholders, and such foreclosure terminates the lease. The result is that, in the absence of a subordination by all bondholders, the Union Oil Company must seek its remedy by personal action for damages against those bondholders who have broken their agreement to protect the lease as against foreclosure, it having failed, as above suggested, to offer to pay off all bonds not subordinated.

If these views be correct, the other assignments of error specified by the Union Oil Company do not require detailed notice. Further findings, or different rulings on the admission or rejection of evidence, could not have affected the findings made on uncontradicted evidence or the legal conclusions which followed. A new trial could not benefit the Union Oil Company. Upon any further hearing the result must be the same as that already reached. The wide discretion allowed to the superior court on motions for new trial will not justify the granting of such motion where, in its findings and judgment, the court reached the only conclusion which it could properly have reached on the record. (*Flood*

v. *Petry*, 165 Cal. 309, 318, [46 L. R. A. (N. S.) 861, 132 Pac. 256].)

On each of the appeals the order is reversed.

Shaw, J., Melvin, J., Victor E. Shaw, J., *pro tem.*, Henshaw, J., and Angellotti, C. J., concurred.