[Civ. No. 8833. Second Appellate District, Division One.—April 13, 1935.]

LEON K. JONAS, Respondent, v. BANK OF AMERICA NATIONAL TRUST & SAVINGS ASSOCIATION (a National Banking Association), Appellant.

Freston & Files and Ralph E. Lewis for Appellant.

Harry G. Sadicoff for Respondent.

CONREY, P. J.—In the complaint it is alleged that at some time prior to September 21, 1931, the defendant became indebted to Irving H. Hellman in the sum of $6,399.49, for and on account of money had and received by the defendant for the use and benefit of said Hellman in connection with the defendant's trust No. 739 N. S. Plaintiff claims as assignee of Hellman's rights to the fund. Judgment having been entered in favor of the plaintiff, the defendant appeals therefrom.

In accordance with the first paragraph of the "second and separate defense" stated in the answer of the defendant, the court found that at all times mentioned in the complaint, the defendant was and now is the trustee of a trust No. 739 N. S., in which Irving H. Hellman, the person mentioned in the complaint was beneficiary; that as trustee under the said trust defendant received the said sum of $6,399.49, which is the money mentioned in the complaint. Paragraph two of said second defense contains the following: "Alleges that on or about June 7, 1931, and prior to either of the assignments mentioned in the complaint herein, the said Irving H. Hellman, for valuable consideration, agreed with defendant that all of said money might be held by the defendant and applied by it upon the indebtedness of the said Harry W. Boles to this defendant, and assigned to this defendant as security for such indebtedness, all of the interest of the said Irving H. Hellman in and to the moneys." The court found the allegations of this paragraph are not true. (Finding VIII.) Appellant contends that this finding VIII is not sustained by the evidence. Paragraph three

of the second defense alleged the said Boles was indebted to the defendant in a sum far in excess of the sum in controversy here. In finding IX the court decided that this allegation was not true, but it is now conceded by respondent that those allegations were true and that the finding IX is erroneous. The court also found against the defendant on the allegations of its paragraph four of the second defense wherein it was alleged that a part or all of said sum of money of $6,399.49 belongs to the said Harry W. Boles, and that defendant holds all of the said fund as security for the repayment of the said indebtedness of the said Harry W. Boles to it.

From the foregoing it appears that the merits of this appeal principally depend upon appellant's challenge to the sufficiency of the evidence to sustain said finding VIII. The property covered by the trust included a tract of land known as tract 9909, containing a certain "lot 4". In October, 1927, Hellman agreed to "sell and convey" to Boles said lot 4, upon certain conditions, one of which was that Boles would erect upon the lot a residence to cost not less than $15,000; thereafter the property should be sold and out of the proceeds of the sale the first $20,000 should be paid to Hellman as the purchase price for his lot. The proceeds of the sale next received were to be used to repay to Boles the actual cost of the improvement made by him thereon; "all moneys received thereafter shall be divided equally between the first and second parties". The house was built and the property was thereafter sold. The evidence does not establish the amount which had been received by Hellman out of the sale price. Appellant attempted to show that by reason of a certain mortgage, Hellman had in effect received his $20,000, but this was not the necessary result of that transaction. The evidence does not prove that the funds now in the trust and which are the subject of the present controversy were the property of Boles. The trust fund was not assigned to him; although as between Boles and Hellman their contracts gave to Boles an interest in the proceeds of the sale of the lot.

It is an admitted fact (although finding IX erroneously runs the other way), that at the time when this controversy arose and at the time when it is claimed that Hellman made

the agreement relied upon as a defense to this action, Boles was indebted to the bank in the sum of $38,500. This was an unsecured indebtedness of Boles to the bank, and the evidence indicates that a part of the money borrowed was used in the building operations on lot 4. But the position of appellant here is shown in appellant's opening brief, page 13, as follows: "However, as is shown by the pleadings, the bank actually placed its claim herein upon the assignment by Mr. Hellman of the funds on deposit, and the case has not been tried as an attempt to collect Mr. Boles' debt direct from Mr. Hellman or Mr. Hellman's property as a direct debt of the joint adventure, though such we believe was the fact."

This limitation of appellant's claim we think was more necessary than generous. Hellman was not obligated on the debt of Boles to the bank, and the bank had acquired no interest in the trust property, nor any lien on the funds resulting therefrom with relation to that debt. Again, we have the statement by appellant "that as Mr. Hellman was on the face of things the sole beneficiary under the trust, his agreement and assignment was necessary even so far as Boles' money was concerned". But this concession does not go quite so far as the record compels us to go. The bank as trustee of the trust was required to recognize Hellman as the sole beneficiary not only on the face of things, but in fact. It was for this reason, of course, that the attempt was made to obtain from Hellman an assignment of the funds.

On a day early in June, 1931, an interview was held between Hellman and three other officers of the bank. These were Louis H. Moore, vice-president; E. J. Nolan, chairman of the board of directors, and R. G. Trengrove, a director. As witnesses to prove the agreement of assignment the defendant produced Nolan and Moore. Mr. Nolan testified as follows: "Q. Then, if you will proceed to relate what was said, in substance, at that conversation. A. Certain moneys had come into the trust of which Mr. Boles was the beneficiary, as I recall, and Mr. Hellman had a certain interest in the trust. What interest he had, I don't know; I don't recall now what interest it was, but I was asked to talk to Mr. Hellman, which I did at that conversation, and asked

him if he would allow this money to be used to pay taxes and interest on other indebtedness of Mr. Boles, and then the balance left, if any, to apply on the unsecured indebtedness of Mr. Boles, and after some discussion, Mr. Hellman readily agreed. Mr. Sadicoff: I move to strike 'readily agreed'. Let's have the conversation. The Court: That expression may go out. A. After certain conversation, Mr. Hellman said that that was perfectly all right—that that could be done, and he would—if I would have prepared the necessary papers, he would sign them. Q. By Mr. Hanson: Was there anything said, as you now recall it, with reference to Mr. Hellman assigning what interest he had in the trust to the bank? A. Yes, there was conversation along that line, and he said he would assign it as security.''

The testimony of Mr. Moore, concerning that interview, while different from that of Mr. Nolan in some of its phrases, is substantially in harmony therewith. On the other hand, Mr. Hellman's testimony, without direct contradiction of the statements of the witnesses Nolan and Moore, presents the interview in a different light. The following are questions addressed to Hellman, and his answers:

''Q. Will you please relate the conversation? A. Mr. Nolan, as I recall, addressed me and asked me whether I would assign the moneys that were coming out of this sale of this one piece of property to Mr. Boles' notes. I understood at the time that he meant that the assignment would be prorated the same as the arrangement that we had on the property, namely, that I was to receive all of my money first—which was stipulated, as I understood, in the trust— that I was to get my money first for my properties and then he was to get his money from his house that he had built on the property, and that after that we were each to receive half of the profits. Mr. Sadicoff: All right; what was the balance of the conversation? A. He asked me, and I said— well, I don't remember exactly what was said, but the conversation was really brought down to the point of how such a document should be drawn, and I believe he instructed Mr. Moore at the time to draw a document or have a document drawn. Q. In other words, your understanding was that you would execute a document which would evidence Boles interest in the trust? A. That is what I understood.

Q. Did you tell any of them that they could use the funds that would be due you, in the payment of the obligations of Boles? A. Not due me—no, sir. Q. Now, did you ever intend that they should use your funds towards the payment of Boles' indebtedness? A. Only for what his share might be. Q. Do you mean as far as you were concerned they could use any moneys that would be due Boles out of the trust in the discharge of his obligations? A. Of which I would make an assignment. Q. In other words, you would execute an instrument showing what Boles' interest was in the trust? A. Yes, sir.''

It is admitted that very promptly after said interview, Mr. Moore, at the request of Mr. Nolan, caused to be prepared an instrument of assignment. This document was submitted to Mr. Hellman, who took advice of counsel and then declined to execute the assignment. Appellant, nevertheless, relies upon the alleged oral agreement as constituting a valid assignment to it of Hellman's interest in the fund, and from that premise argues that finding VIII is not supported by the evidence.

It is apparent, from reading Mr. Nolan's testimony that he had not deemed it necessary to precisely define, even in his own mind, the subject under discussion. It is a reasonable inference from the conversation as related, that they were endeavoring, not to make a present contract, but to arrive at a preliminary understanding, to result in a written instrument which would be signed upon approval of its terms. The testimony of Hellman shows that his understanding of the thing proposed was not identical with that of the other parties. We are of the opinion that the court was justified in making the said finding VIII, for at least two reasons: First, that there was no meeting of the minds of the opposing parties upon the definition and terms of the proposed assignment; and second, that the parties, at the time of said interview contemplated the execution of a written instrument, the terms of which were left open for further consideration. (*Mercantile Trust Co.* v. *Sunset Road Oil Co.*, 176 Cal. 461, 469 [168 Pac. 1037].)

The judgment is affirmed.

Houser, J., and York, J., concurred.